Argued and submitted October 1, 1979,
affirmed as modified May 28,
petition for rehearing denied July 2, 1980

JARVILL,
*Petitioner,*

*v.*

CITY OF EUGENE, et al,
*Respondents.*

LICHTY,
*Petitioner,*

*v.*

CITY OF EUGENE, et al,
*Respondents.*

CITY OF EUGENE,
*Respondent,*

*v.*

GREAT WESTERN SCHISM, INC.,
*Petitioner.*

(CA 8516, SC 26299)

613 P2d 1

158

Larry R. Roloff, Eugene, argued the cause and filed briefs for petitioners.

Leslie M. Swanson, Jr. Eugene, argued the cause for respondents. With him on the briefs were Orval Etter and Johnson, Harrang & Mercer, Eugene.

James A. Redden, Attorney General, and Ira Jones, Senior Assistant Attorney General, Salem, filed an amicus curiae brief for the Department of Revenue.

HOWELL, J.

## HOWELL, J.

These three cases, consolidated for trial and appeal, involve a comprehensive challenge to the validity of a charter amendment and various ordinances enacted by the City of Eugene ("City") to revitalize its downtown core area. Eugene, like many other cities, became concerned that its downtown business area was not economically competitive with outlying shopping areas for various reasons, including the lack of adequate parking facilities.

In July, 1973, the voters approved an amendment to the charter conferring on the city council the power

"To establish, and from time to time to change the boundaries of, a downtown development district; for purposes of public parking facilities for vehicles in the district, of public transportation in, to, and from the district, and of economic promotion and development for the district, to tax persons, property, and economic enterprise in the district; and to establish one or more agencies to assist the city in the exercise of those powers." Eugene City Charter, ch. VII, § 48(70) (1973).

Pursuant to the charter amendment, the council enacted ordinances which provided free parking within the Downtown Development District ("District"), but which restricted parking by employers and employees of District businesses, by District residents, and by District hotel or motel guests. In order to finance and administer its economic development and its free parking programs, the City enacted ordinances for the levying of certain taxes. An ordinance allowed for an ad valorem real property tax by the City on real property in the District;[1] another ordinance provided for a tax of $2.50 per $1,000 of gross retail sales and receipts from nonprofessional businesses within the District; and a third imposed a tax of $40 on professional businesses within the District for each

---

[1] The voters approved a measure allowing the City to levy a tax of $129,250 on real property in the district in excess of the six percent limit prescribed by article XI, § 11, of the Oregon Constitution.

quarter of the year per each professional and each employee of a professional.

In 1974 Jarvill and Lichty filed complaints for declaratory judgments in the Circuit Court of Lane County alleging that the City ordinances are unconstitutional. In 1975 the City sued Great Western Schism, owner of a retail store located within the District, to recover unpaid gross sales and receipts taxes levied in the District. Because Great Western Schism raised defenses identical to the complaints of Jarvill and Lichty, the circuit court consolidated the three cases.[2]

In the trial court and in the Court of Appeals the plaintiffs have raised numerous contentions challenging the validity of the charter amendment and the City ordinances relating to the District taxes. Generally, plaintiffs contend that the taxes are unlawful or beyond the City's power. Plaintiffs also contend that the ad valorem property tax and the professional and nonprofessional business taxes violate the separate guarantees of equality found in Article I, sections 20 and 32, of the Oregon Constitution and in the fourteenth amendment to the United States Constitution in two general ways: (1) in that property and businesses within the District are taxed while similar property and businesses in other parts of the city are not subject to similar taxation; and (2) in that not all real property and not all businesses within the District are taxed equally. For these same reasons, and particularly because the taxes apply only to District property, plaintiffs contend that the District taxes violate the Uniformity of Taxation Clause of article I, section 32, of our state constitution. Finally, among a myriad of other less substantial challenges, plaintiffs contend that the restrictions on parking in the District

---

[2] Because all three cases involve the same issues, we shall refer to the three opponents to the measures as plaintiffs.

violate art I, § 20, of the Oregon Constitution and the fourteenth amendment to the United States Constitution.[3]

The trial court upheld the charter amendment and the taxing ordinances in all respects. The Court of Appeals affirmed the trial court except that the Court of Appeals *sua sponte* held that the tax court and not the circuit court had jurisdiction over plaintiffs' challenges to the validity of the ad valorem property taxes. 40 Or App 185, 594 P2d 1261 (1979).

We will first discuss the issue of whether the circuit court or the tax court had jurisdiction over the challenges to the ad valorem real property tax levied by the City on property within the District.

## I. CIRCUIT COURT JURISDICTION

The exclusive jurisdiction of the tax court extends to "all questions of law and fact arising under the tax laws of this state." ORS 305.410(1).[4] Further-

---

[3] The Court of Appeals characterized all the plaintiffs' challenges as a "scattershot pattern of contentions." Apparently the Court of Appeals was influenced by the fact that plaintiffs' challenges ranged from contentions that the ordinances violated equal protection and uniformity of taxation to a contention that the ordinances violated the canons of legal ethics.

[4] ORS 305.410 reads as follows:

"(1) Subject only to the provisions of ORS 305.445 relating to judicial review by the Supreme Court and to subsection (2) of this section, the tax court shall be the sole, exclusive and final judicial authority for the hearing and determination of all questions of law and fact arising under the tax laws of this state. For the purposes of this section, and except to the extent that they preclude the imposition of other taxes, the following are not tax laws of this state:

"(a) ORS 577.110 to 577.605 relating to beef council contributions.

"(b) ORS 576.051 to 576.584 relating to commodity commission assessments.

"(c) ORS chapter 477 relating to fire protection assessments.

"(d) ORS chapters 731, 732, 733, 734, 737, 743, 744, 746, 748 and 750 relating to insurance company fees and taxes.

"(e) ORS chapter 473 relating to liquor taxes.

"(f) ORS chapter 583 relating to milk marketing, production or distribution fees.

more, the state legislature has provided that no person may contest in a circuit court any matter within the jurisdiction of the Oregon Tax Court. ORS 305.410(3).

The Court of Appeals reasoned that, because ad valorem property taxation in Oregon is comprehensively governed by state law, the City's property tax was levied under the tax laws of this state, and the challenges to the City's property tax presented questions of state tax law that are within the exclusive jurisdiction of the Oregon Tax Court.[5]

Unfortunately the tax court jurisdiction statute has never been a picture of statutory clarity.

"(g)  ORS chapter 767 relating to motor carrier taxes.

"(h)  ORS chapter 319 relating to motor vehicle and aircraft fuel taxes.

"(i)  ORS title 39 relating to motor vehicle and motor vehicle operators' license fees and boat licenses.

"(j)  ORS chapter 578 relating to wheat commission assessments.

"(k)  ORS chapter 562 relating to racing taxes.

"(l)  ORS chapter 657 relating to unemployment insurance taxes.

"(m)  ORS chapter 656 relating to workers' compensation contributions, assessments or fees.

"(n)  ORS chapter 579 relating to potato commission assessments.

"(o)  ORS 311.420, 311.425, 311.455, 311.650, 311.655 and ORS chapter 312 relating to foreclosure of real and personal property tax liens.

"(2)  The tax court, the circuit courts and district courts shall have concurrent jurisdiction to try actions or suits to determine the priority of property tax liens in relation to other liens.

"(3)  Except as permitted under section 2, amended Article VII, Oregon Constitution, this section and ORS 305.445, no person shall contest, in any action, suit or proceeding in the circuit court or any other court, any matter within the jurisdiction of the tax court."

[5] With respect to questions of law regarding the city's taxes on professional and nonprofessional businesses within the District, the Court of Appeals held that the circuit court had jurisdiction because these taxes were enacted pursuant to the city's charter authority rather than under the tax laws of Oregon.

Originally, ORS 305.410 provided that the tax court would be the "sole, exclusive and final authority for the hearing and determination of all questions of law and fact arising under the tax laws of the state *in cases within its jurisdiction.*" Or Laws 1961, ch 533, § 12 (emphasis supplied). In the same legislation that created the Oregon Tax Court and added ORS 305.410, the legislature amended sections of ORS chapters 306, 308, 311 (all concerned with county property taxation regulated by state law), chapter 314 (state income taxation), and chapters 321 and 528 (state forest taxation) to expressly provide for appellate review of determinations and assessments in the fields of property, income, and forest taxation. *See* Or Laws 1961, ch 533, §§ 41 to 56. The original legislation therefore established a tax court with limited jurisdiction over three fields of taxation.

The first tax court jurisdictional problem encountered by this court involved the question whether the tax court had authority to issue a writ of mandamus to require a county assessor to extend a particular levy upon the county tax rolls. In *Woodburn v. Domogalla,* 238 Or 401, 395 P2d 150 (1964), we stated:

"The jurisdiction of the tax court is nowhere expressly defined. ORS 305.410 * * * is not helpful in defining the court's jurisdiction. It simply provides that in cases within its jurisdiction, *whatever that may be,* the tax court has the exclusive and final authority to adjudicate questions arising under the tax laws of this state." 238 Or at 405 (emphasis in original).

We held that the tax court's original jurisdiction to hear tax questions was limited and that mandamus cases were not "cases within its jurisdiction" under ORS 305.410.

The legislature responded to the *Woodburn* decision by amending the tax court statutes to provide the tax court with general (not limited) jurisdiction and the same powers as a circuit court to exercise all

ordinary and extraordinary legal, equitable and provisional remedies. *See, e.g.,* ORS 305.405, 305.435, 34.120; Or Laws 1965, ch 6, §§ 1, 6, 10. The legislature also amended the language of tax court jurisdiction to include jurisdiction over "proceedings" to set aside an order of the State Tax Commission, not just "appeals" from the State Tax Commission. *See, e.g.,* ORS 305.425, 305.515, 321.470, 321.660, 321.765; Or Laws 1965, ch 6, §§ 3, 8, 13-15.

Presumably to further clarify its expansion of tax court powers,[6] the legislature changed the language of ORS 305.410. The phrase, "in cases within its jurisdiction," was deleted, and the legislature added a list of state levied taxes and assessments that "are not tax laws of this state" and therefore not within the exclusive jurisdiction of the tax court. Thus, ORS 305.410 was amended to substantially its present form. Or Laws 1965, ch 6, § 2. Two concepts remained, however. First, the legislature separately provided for tax court jurisdiction over specific taxes: the county property tax, the state income tax, and the state forest tax.[7] Second, where the legislature did not provide for jurisdiction over a specific tax, it generally provided for tax court jurisdiction over "the tax laws of this state," in ORS 305.410(1).

■ The City contends that tax laws enacted by a city government are "tax laws of this state," because a city's authority ultimately comes from the state. We do not agree. ORS 305.410(1) says "tax laws *of this state.* " The plain and natural meaning of this phrase is that the tax law must be enacted by the state governmental authority. *Cf. Girt et al v. Tri-Met et al,* 4 OTR 92, 96-98 (1970).

---

[6] The major changes were for the purpose of clarifying the original jurisdiction and general powers of the tax court. *See* Or Laws 1965, ch 6, § 16.

[7] Later the legislature added ORS 323.416, providing for tax court review of state cigarette taxation, and ORS 305.115, providing for tax court review of Department of Revenue orders. These are two additional examples of tax court jurisdictional provisions codified outside of ORS 305.410.

This conclusion is supported by the legislature's use of the term "tax laws of this state" in ORS 305.410(1) when it listed the several tax laws that "are not tax laws of this state." ORS 305.410(1)(a) to (o). These tax laws are state enacted taxes, assessments, fees and contributions imposed by state statutes, for example, fire protection assessments (ORS ch 477), liquor taxes (ORS ch 473), and motor carrier taxes (ORS ch 767). The exclusion of these specific taxes indicates that the legislature intended, by the phrase "tax laws of this state," to include all other state taxes imposed and administered by the state.[8]

On the other hand, we find no evidence that the legislature intended that tax laws enacted by a city government are "tax laws of this state" subject to the exclusive jurisdiction of the tax court by virtue of ORS 305.410(1). On the contrary, when the legislature did intend to grant the tax court jurisdiction over a tax law enacted by a city government, it did so by *separately* providing for tax court jurisdiction over specific *state-related* aspects of the local taxation. For example, when a state agency enters into an agreement with a political subdivision to collect, administer and distribute local taxes imposed upon or measured by gross or net income or wages and local general sales and use taxes, then the Oregon Tax Court has exclusive jurisdiction to review the state agency's orders relating to its administration of the local taxes. *See* ORS 305.620. Also, when a local tax levy is made contrary to the state local budget law (ORS 294.305 to 294.520) or any other state law relating to tax levies, the local tax shall be voidable in the Oregon Tax Court by following a specific procedure. ORS 294.485. *See*

---

[8] Later amendments to ORS 305.410 and to the jurisdiction of the tax court support our conclusion. In 1971 the legislature removed gift and inheritance taxes from the list of taxes that "are not tax laws of this state" in ORS 305.410(1). *See* Or Laws 1971, ch 567, § 14. In the same legislation, ORS 118.410 was amended to provide for tax court jurisdiction over the state inheritance tax law and ORS 119.280 was amended to provide for tax court jurisdiction over the state gift tax law. Or Laws 1971, ch 567, §§ 10, 13.

*Girt et al v. Tri-Met et al, supra.* These statutes are separate jurisdictional provisions for tax court review when a local tax conflicts with state law or is administered by a state agency.[9]

We therefore hold that, by the phrase "tax laws of this state," the legislature intended that the tax court have exclusive jurisdiction to decide questions that arise under tax laws enacted by the state government. Plaintiffs challenge the City charter amendment and City ordinances that impose the City property and business taxes. Because these tax laws were enacted by the City, they are not "tax laws of this state." The questions presented by these challenges were properly litigated in the circuit court.

But the City contends that, because plaintiffs challenge the City property and business taxes as violative of article I, section 32, of the Oregon Constitution, and because that constitutional provision is a tax law of this state, plaintiffs' challenge based on article I, section 32, is a "question * * * arising under the tax laws of this state" which must be litigated in the tax court. Assuming but not deciding that article I, section 32, is a tax law of this state, the City's interpretation of ORS 305.410(1) reveals another problem with that statutory provision which we must now resolve. According to the City, the tax court has jurisdiction whenever a party, who may be challenging a tax levied by a city, raises a challenge based on, or a question relating to, a tax law of this state. If the same party in the same proceeding, however, raises a challenge not related to a tax law of this state, then presumably that challenge would be litigated in the circuit court. This

---

[9] We note that several cases involving local taxation have been litigated in the circuit courts and the Court of Appeals rather than in the tax court. *See, e.g., Budget Rent-A-Car v. Multnomah County,* 287 Or 93, 597 P2d 1232 (1979) (county tax); *Horner's Market v. Tri-County Trans.,* 2 Or App 288, 467 P2d 671, *rev. denied* 256 Or 124, 471 P2d 798 (1970) (metropolitan transportation district tax). *Cf. Girt et al v. Tri-Met et al,* 4 OTR 92 (1970)(interpreting "tax laws of this state" under ORS 305.410 as encompassing taxes imposed by the legislature and not encompassing a tax imposed by a municipal corporation).

result—split jurisdiction—is patently unreasonable because it would require a city taxpayer challenging a city tax to institute two separate proceedings in two separate courts.[10]

■      We do not believe that the legislature intended the application of ORS 305.410(1) to result in split jurisdiction or that the tax court have jurisdiction over a challenge to a city tax, which is not a tax law of the state, merely because the challenge includes a question regarding a tax law enacted by the state. In construing the application of ORS 305.410(1), we must seek to avoid absurd or unreasonable results. *Hollinger v. Blair/Dickson,* 270 Or 46, 53-54, 526 P2d 1015 (1974). In order to avoid split jurisdiction, and in order to litigate all of the challenges to a tax in only one court, jurisdiction under ORS 305.410(1) must be determined by whether *the tax being challenged* is itself a tax law of this state. In other words, when the legislature declared that the tax court has jurisdiction over "all questions * * * arising under" the state tax laws, the legislature intended that, under ORS 305.410(1), the tax court have jurisdiction only when the complaint challenges a state tax, that is, a tax imposed by the state government.[11] When the complaint challenges a tax imposed by a city (and not administered through the county property tax system), then no question arises under a state tax law, and the litigation may proceed in the circuit court,

---

[10] The result of split jurisdiction is more pronounced in the following example. According to ORS 305.410(1)(e), the laws in ORS chapter 473 relating to liquor taxes are not tax laws of this state. Therefore, a taxpayer challenging his liquor tax because he is entitled to, but did not receive, a tax credit under ORS 473.030(6) would have to file his proceeding in the circuit court. If the taxpayer also challenges his liquor tax on the basis of another statute that is a tax law of this state, according to the City's reasoning, that challenge could not be litigated in the circuit court but must be filed in the tax court.

[11] As noted above, the legislature has given the tax court jurisdiction over other taxes and tax questions by statutory provisions separate from ORS 305.410(1). In the present case we are interpreting only the effect of ORS 305.410(1).

unless jurisdiction in the tax court is separately and specifically provided outside of ORS 305.410(1).

In the instant case, plaintiffs challenge taxes imposed by the City pursuant to its home rule authority. All questions presented by their challenge are within the jurisdiction of the circuit court and were properly litigated therein. We therefore hold that the circuit court had jurisdiction over plaintiffs' challenges to the ad valorem property tax[12] and the other City taxes.

## II. MUNICIPAL AUTHORITY

Before we discuss plaintiffs' constitutional challenges to the City's property and business taxes, we should answer plaintiffs' contentions that the City was without authority to establish the District and to impose taxes within the District. Plaintiffs argue that no state statute or case exists which will support the City's charter amendment and the City's creation of the District. They also argue that no state statute authorizes a city to select a portion of its citizens for unique and special tax treatment.

■ We agree with the Court of Appeals and the circuit court that the District was validly established. The Oregon Constitution, in article XI, section 2, provides that "[t]he legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the constitution and criminal laws of the State of Oregon, * * *." Also, article IV, section 1(5), of the Oregon Constitution provides that the initiative and referendum powers are reserved "to the qualified voters of each municipality and district as to all local, special and municipal legislation of every character in or for their municipality or district.

---

[12] Like the Court of Appeals, we limit our review to the ad valorem property taxes levied by the City for the two years, 1973-74 and 1974-75. We are not concerned with the City's argument that the District ad valorem real property tax was converted in April of 1975 into a tax on the ownership of real property. 40 Or App at 191 n. 2.

* * *" These "home rule" provisions permit the people of a city or town to decide upon the organization of their government and the scope of its powers under its charter, without the need to obtain statutory authorization from the legislature. *See LaGrande/Astoria v. PERB,* 281 Or 137, 142, 576 P2d 1204, *aff'd on rehearing* 284 Or 173, 586 P2d 765 (1978). The charter amendment, passed by the voters of the City in 1973, validly conferred authority on the city council to establish the District and to impose taxes in the District. These charter powers are valid unless they contravene state or federal law. *LaGrande/Astoria v. PERB, supra* 281 Or at 142.

■   The courts below also correctly held that the City had authority to impose taxes within the District. A municipal corporation may assume powers to impose taxes and to select the kinds of taxes most appropriate in order to provide governmental services. *See, e.g., Horner's Market v. Tri-County Trans.,* 256 Or 124, 131, 471 P2d 798 (1970); *Davidson Baking Co. v. Jenkins et al,* 216 Or 51, 55-59, 337 P2d 352 (1959). The power to impose taxes in the District is expressly provided in the following language of the charter amendment: "for the purposes of public parking ***, of public transportation ***, and of economic promotion and development for the district, *to tax persons, property and economic enterprise* in the District; * * *." (Emphasis supplied.) We interpret the charter amendment to provide express, implicit and essential authority for the property tax, the professional business tax, and the nonprofessional gross sales and receipts tax levied by the City. *Robertson v. Portland,* 77 Or 121, 126-28, 149 P 545 (1915).

■   The plaintiffs also contend that the City acted beyond its authority because the revenues from the District taxes—which the Downtown Development Board budgets for a free parking program and for an advertising program partially administered by the Eugene Downtown Association—are not used for a public purpose and are used to invest public funds in

private enterprise, in violation of article XI, section 9, of the Oregon Constitution.[13]

The City of Eugene established the District to finance and administer "a program of economic promotion and development" within the city's central business district. Eugene Code, §§ 2.380, 2.381 (1971). The City's objective is to revitalize the central business district by promoting business in the area, by increasing downtown property values, by encouraging downtown shopping, and by improving services within the downtown area.[14] We agree with the circuit court that the City has shown that there would be a general benefit to the economy of the City as a result of the economic improvement of the City's central business district. Thus the City's program of free parking and District advertising serves a legitimate public purpose. *See Carruthers v. Port of Astoria,* 249 Or 329, 341, 438 P2d 725 (1968). We also agree with the trial court's finding that the City's arrangements for the free parking and advertising programs do not expose the taxpayers to any of the risks contemplated by article XI, section 9. This finding, plus the finding that the public funds are expended for a public benefit, leads us to conclude that the District tax revenues are not being spent for private enterprise in violation of article XI, section 9, of the Oregon Constitution. *See Carruthers v. Port of Astoria, supra* at 333-40.

## III. UNIFORMITY OF TAXATION

We shall now discuss plaintiffs' contentions that the City's ad valorem property tax, professional

---

[13] Article XI, section 9, provides in part:

"No county, city, town or other municipal corporation by vote of its citizens, or otherwise, shall become a stockholder in any joint company, corporation or association, whatever, or raise money for, or loan its credit to, or in aid of, any such company, corporation or association. * * * ."

[14] For a discussion of other city programs and other methods for revitalizing central business districts, *see* Weaver & Duerksen, *Central Business District Planning and the Control of Outlying Shopping Centers,* 14 Urban L Ann 57 (1977).

business tax and gross sales and receipts tax on non-professionals violate the Uniformity of Taxation Clause of the Oregon Constitution (art I, § 32), the Privileges and Immunities Clause of the Oregon Constitution (art I, § 20), and the Equal Protection Clause of the United States Constitution (amend XIV).

Article I, section 32, of the Oregon Constitution is the constitutional provision that most specifically addresses the issue of uniform taxation. That section provides:

> "* * *[A]ll taxation shall be uniform on the same class of subjects within the territorial limits of the authority levying the tax."

Plaintiffs argue that this constitutional provision requires that a city tax be uniform throughout the boundaries of the city levying the tax and that a city is prohibited from imposing a tax on an area within its boundaries smaller than the whole of its city limits.[15] Plaintiffs thus argue that the taxes levied exclusively within the District, which is only a portion of the city, violate the requirement of territorial uniformity found in article I, section 32.

---

[15] Plaintiffs contend that territorial uniformity is also required by Article IX, section 1, of the Oregon Constitution, which provides:

"The Legislative Assembly shall, and the people through the initiative may, provide by law uniform rules of assessment and taxation. All taxes shall be levied and collected under general laws operating uniformly throughout the State."

Plaintiffs do not distinguish between article IX, section 1, and article I, section 32. We have held that these two constitutional provisions requiring tax uniformity are to be read together. *State ex rel v. Malheur County Court,* 185 Or 392, 411, 203 P2d 305 (1949).

The two provisions, however, are not identical. Although article IX, section 1, requires uniform taxation, the specific requirement of *territorial* uniformity is expressed in article I, section 32. If the City taxes do not violate the territorial requirement of article I, section 32, then the taxes do not violate article IX, section 1, in that respect.

Furthermore, article I, section 32, applies to all taxation, state and local, while article IX, section 1, appears to apply only to those taxes that operate throughout the state. Taxes levied by a city, such as those in the instant case, do not operate throughout the state.

The Court of Appeals held that article I, section 32, which permits a municipality to classify for tax purposes, merely requires uniform tax treatment *within each class* throughout the territory, and that all the businesses subject to the District taxes are members of a constitutionally valid class.

Plaintiffs contend, however, that the properties and businesses in the District cannot be considered a separate class from all other properties and businesses in the City because the only common characteristic shared by the properties and businesses in the District is their location.

The instant case therefore presents us with the question whether article I, section 32, prohibits a governmental authority from *territorially* defining a class of subjects for the purpose of separate tax treatment. And, if a territorial classification is not absolutely prohibited, under what criteria is a territorial classification constitutionally valid?

Resolution of these problems requires us to review the history of article I, section 32, as originally drafted, interpreted and applied. Then we will examine the intentions of the drafters of the 1917 amendment that changed article I, section 32 to its present form.

*Territorial Uniformity Prior to 1917.*

Originally, in the Oregon Constitution of 1859, article I, section 32, provided: "* * * [A]ll taxation shall be equal and uniform." In addition, article IX, section 1, originally provided:

"The Legislative Assembly shall provide by law for uniform and equal rate of assessment and taxation; * * *."

The simple language of these provisions was intended to prevent anyone from escaping his just share of the tax burden, and these requirements of "equal and uniform" taxation can be traced to a public distrust of state legislatures who were likely and willing to aid

railroads and other private economic enterprises by levying state and local taxes to assist private construction and by granting privileges and tax exemptions to vested interests. *See* Report of Board of State Tax Commissioners 15-16 (1911). *Cf. Township of Pine Grove v. Talcott,* 86 US (19 Wall) 666, 22 L Ed 227 (1873). The constitutional requirements of equal and uniform taxation, in Oregon as in other states, resulted in the general property tax—the taxation of everything, tangible and intangible, by one uniform rule. *See* Judson on Taxation 562 (1903). *See generally Standard Lumber Co. v. Pierce et al,* 112 Or 314, 333-334, 228 P 812 (1924).

Territorial uniformity was a judicial concept that appears to have developed from a strict interpretation of the requirements of uniformity and equality in taxation. Simply stated, the territorial uniformity concept required that a tax operate uniformly throughout the territorial limits of the government authority within and for which the tax was raised. In other words, it required that a tax levied by the state (for a state purpose) be uniform throughout the state, a tax levied by a county (for a county purpose) be uniform throughout the county, and so on. *See, e.g., Yamhill County v. Foster,* 53 Or 124, 99 P 286 (1909); *Cook v. The Port of Portland,* 20 Or 580, 27 P 263 (1891); *City of East Portland v. County of Multnomah,* 6 Or 62 (1876); *Board of Comm'rs of Jackson County v. State ex rel Shields,* 155 Ind 604, 58 NE 1037 (1900); *Watkins v. Barrow,* 121 Va 236, 92 SE 908 (1917); *Day v. Roberts,* 101 Va 249, 43 SE 362 (1903); *The People v. Salem,* 20 Mich Rep 452, 474, 4 Am Rep 400 (1870); *Knowlton v. Supervisors of Rock County,* 9 Wis Rep 410 (1859); *Exchange Bank of Columbus v. Hines,* 3 Ohio St 1 (1853); Gray, Limitations of Taxing Power and Indebtedness 670, § 1351b (1906); Cooley, Constitutional Limitations 711, 726 (7th ed Lane 1903). *See also Township of Pine Grove v. Talcott, supra; Gilman v. City of Sheboygan,* 67 US (2 Black) 510, 17 L Ed 305 (1862). The concept was so widely accepted that, as one legal scholar observed, "[i]n some of the consti-

tutions this rule is expressly stated, but where it is not thus expressly stated the constitutions are interpreted in conformity with it." Gray, *supra* at 670.[16]

> [16] The requirement that taxation be uniform throughout the tax district, as expressed prior to 1917, was summarized in the following analysis of one legal scholar of that era:

> "* * * A requirement of uniformity does not mean that the rate of taxation shall be exactly the same in every subdivision of the state. The legislature may create taxing districts for special purposes and may levy taxes in those districts for purposes germane to the objects for which the districts are created.

> "The rule only requires that taxation shall be uniform within the limits of the authority levying the tax, that is, that a tax levied for state purposes shall be uniform throughout the state, a tax levied for county purposes shall be uniform throughout the county, and so on. In some of the constitutions this rule is expressly stated, but where it is not thus expressly stated the constitutions are interpreted in conformity with it.

> "There is uniformity and equality of assessment and taxation where the same basis of assessment is fixed for all property, and the same rate of taxation is fixed within the district subject to taxation. If it be a tax for state purposes, there is equality and uniformity where the rate is the same throughout the state; if for county or township purposes there is equality and uniformity where the rate is the same throughout the county or township. So long as this result is reached, it makes little or no difference by how many or by what agencies it is accomplished." Gray, *Limitations of Taxing Power and Indebtedness* § 1351b at 670 (1906). (Footnotes omitted.)

> *See also,* Cooley, Constitutional Limitations 726 (7th ed Lane 1903):

> " * * * The rule of apportionment must be uniform throughout the taxing district, applicable to all alike; but the legislature have no power to arrange the taxing districts arbitrarily, and without reference to the great fundamental principle of taxation, that the burden must be borne by those upon whom it justly rests. * * *"

> It is interesting to note, however, that decisions of this court prior to 1917 that recognized and applied the rule of territorial uniformity of taxation nevertheless permitted some territorially defined differentials in taxation. *See, e.g., Johnson v. Jackson County,* 68 Or 432, 136 P 874 (1914); *City of East Portland v. County of Multnomah,* 6 Or 62 (1876). Other state courts also permitted some exception to the requirement of territorial uniformity. *See, e.g, Watkins v. Barrow,* 121 Va 236, 92 SE 908 (1917); *Daly v. Morgan,* 69 Md 460, 16 A 287 (1888).

> In one comprehensive study of constitutional provisions requiring uniformity of taxation, the author dismissed the importance of a territorial uniformity requirement in the following words:

> "* * * A geographical connotation is a part of the complete idea symbolized in the term, and quite often the expression 'within the

## Territorial Uniformity after 1917

The requirement of territorial uniformity was altered when the Oregon Constitution was amended in 1917 to provide for classification in taxation. Dissatisfaction with the "uniform and equal" provisions of the Oregon Constitution had previously led to the appointment in 1905 of a commission for the purposes of examining and reporting upon matters of state assessment and taxation of property. The following portions of the commission's report are enlightening:

"The constitutional provisions of this State have been found in the past to be unnecessarily rigid. Apparently by tacit consent they have been waived in certain instances. For instance, for many years exemptions have been allowed, not permitted by the constitution, of one class of property or another, * * *.

"Of recent years there has been a growing tendency in this State, in common with many other States of the Union, to divorce one class of property from another for the purpose of raising revenue for state purposes as distinguished from local. * * *

"However, this principle has been extended almost as far as now seems possible, inasmuch as under our present constitutional provisions such taxes, ordinarily designated as specific taxes, must be entirely supplemental to the general property tax contemplated by the constitution. Unless our constitutional provisions be made more elastic it is difficult to see how this principle can be further extended. * * * Your Commission has drafted the following amendments to the constitutional provisions quoted, which it believes are sufficiently elastic *to permit the selection of the classes of taxable property* by the legislature, the assignment of one class of property for either the

territorial limits of the taxing authority' occurs in the constitutions; but geographical uniformity is not a primary basis for limiting the taxing power, either of the states or the federal government. Its purpose is to create what may be thought of as an administrative rule for the uniform execution of such tax legislation as the legislature may enact, and logically falls outside the expressed concern of this discussion." Matthews, *The Function of Constitutional Provisions Requiring Uniformity in Taxation,* 38 Ky L J 31, 56 (1949).

application of the property tax or the specific tax beyond the privilege tax, and *yet will maintain the present requirements of uniformity and equality within each class itself.* \* \* \*" Report of Tax Commission 8-9 (1906). (Emphasis supplied.)

The Commission then recommended that article I, section 32, be amended to read:

" ' \* \* \* [A]ll taxation shall be equal and uniform *upon the same class of subjects within the territorial limits of the authority levying the taxes.' " Id.* (Emphasis in original.)

And the Commission recommended that article IX, section 1, be amended to read:

" '\* \* \* The legislative assembly shall provide by law for uniform and equal rate of assessment and taxation *upon the several classes of subjects of taxation within the territorial limits of the authority levying the taxes; \* \* \*.' " Id.* (Emphasis in original.)

These recommendations appear to have been the first proposals in Oregon for amending article I, section 32, by using the phrase "upon the same class of subjects within the territorial limits of the authority levying the tax." Although different language was used in the amendments submitted to the Oregon voters in 1910,[17] in 1912,[18] and in 1914,[19] the purpose of the amendments never changed. They were intended to permit the reasonable classification of sub-

---

[17] The amendment to article I, section 32, submitted in 1910 would have omitted the words "and all taxation shall be equal and uniform" and inserted the words "taxes shall be levied and collected for public purposes only, and the power of taxation shall never be surrendered, suspended, or contracted away." *See* Voters' Pamphlet, General Election, November 8, 1910, p. 24.

[18] The amendment to article 1, section 32, submitted in 1912 would have provided uniform taxation upon each separate class with the territorial limits of the authority levying the tax and would have permitted taxes to be levied upon different classes of property at different rates. *See* Voters' Pamphlet, General Election, November 5, 1912, p. 21.

[19] The amendment to article I, section 32, submitted in 1914 was identical to that proposed in 1910. At the same time an amendment to article IX, section 1, was submitted that provided for "reasonable classifications of the subjects of taxation." *See* Voters' Pamphlet, General Election, November 3, 1914, pp. 12-13.

jects of taxation, the exemption of certain property from taxation, and the imposition of different rates of taxation upon different classes of property. *See, e.g., Standard Lumber Co. v. Pierce et al, supra,* 112 Or at 335; Reed, *For Equal Distribution of Tax Burden,* Oregon Voter 10-13 (May 19, 1917); Voters' Pamphlet, Special Election, June 4, 1917, pp 14-15; Message of Oswald West, Governor of Oregon, p 41 (1915); Voters' Pamphlet, General Election, November 5, 1912, pp 22-30; Message of Oswald West, Governor of Oregon, pp 4-5 (1911); Report of Board of Tax Commissioners 19-21, 27 (1911); Voters' Pamphlet, General Election, November 8, 1910, pp 24-25; Report of Tax Commission 5-10 (1906).

Although the primary purpose of the 1917 amendments was to permit classification, the use of the phrase "within the territorial limits of the authority levying the tax" raised the principle of territorial uniformity to that of an express constitutional requirement. But the drafters intended a requirement of territorial uniformity within each class of subjects taxed. Thus *Standard Lumber Co. v. Pierce et al, supra,* in discussing the 1917 amendments to article I, section 32, and article IX, section 1, stated that "*among the members or objects included in a class* selected by the legislature, inherent uniformity as well as *territorial uniformity is required.* " 112 Or at 336. (Emphasis supplied.) Indeed, the intentions of the drafters of the amendments can be traced back to the 1905 commission which, as quoted above, sought to draft constitutional provisions

" * * * sufficiently elastic to permit the selection of the classes of taxable property * * *, and yet * * * maintain the present requirements of uniformity and equality *within each class itself.* " Report of Tax Commission 9 (1906) (emphasis supplied).

Thus, once a taxing authority selects a class for taxation, the tax must apply uniformly among all objects

in the class that are within the territorial limits of the authority levying the tax.[20]

## *Territorial Classification*

Plaintiffs contend that article I, section 32, prohibits a taxing authority from classifying the subjects of taxation according to a geographical location. They further contend that the only common characteristic shared among those taxed in the District is their location.

Past decisions of this court have recognized the role of the judiciary in reviewing the constitutionality of tax classifications, but we have also recognized and expressly held that a taxing authority has a wide range of discretion to classify subjects of taxation. *See, e.g., Huckaba v. Johnson,* 281 Or 23, 25-26, 573 P2d 305 (1978); *Tharalson v. State Dept. of Rev.,* 281 Or 9, 16, 573 P2d 298 (1978); *Dutton Lbr. Corp. v. Tax Com.,* 228 Or 525, 539, 365 P2d 867 (1961); *Smith et*

---

[20] Plaintiffs argue that in *State ex rel v. Malheur County Court,* 185 Or 392, 411, 203 P2d 305 (1949), we held that article I, section 32, and article IX, section 1, require that taxation shall be uniform within the territorial limits of the authority levying the tax and that the rate of taxation must be equal and uniform "throughout the taxing district, whether state or local" (*quoting* from *Yamhill County v. Foster,* 53 Or 124, 129, 99 P 286 (1909). Plaintiffs' reliance on *Malheur County,* however, is misplaced. That case involved challenges to a state statute requiring counties to levy a tax to pay their share of state public welfare according to the need for relief funds in each county. We reasoned that "* * * if a tax is equal and uniform throughout the taxing district, there is no violation of the constitutional mandate [of uniform taxation]." *Id.* 185 Or at 411. We then concluded that:

> "In our opinion, chapter 545 [the state statute in question] imposes a duty upon each county to levy a county tax. * * * Since the tax required to be levied is a county tax, and since the levy will be uniform within each county, there is a sufficient compliance with the provisions of the constitution requiring uniformity." *Id.* at 412.

Thus, we did not hold that *all* taxation *must* be uniform throughout the taxing district; we merely held that a tax that is uniform throughout the taxing district is constitutional. Our statements in *Malheur County,* that a tax must be uniform within the territorial limits of the authority levying the tax and that the rate of taxation must be uniform throughout the taxing district, were only *dicta.* We note in particular that *Yamhill County,* was decided prior to the 1917 amendments to article I, section 32, and article IX, section 1.

*al v. Columbia County et al,* 216 Or 662, 341 P2d 540 (1959); *Wittenberg et al v. Mutton et al,* 203 Or 438, 280 P2d 359 (1955); *Garbade and Boynton v. City of Portland,* 188 Or 158, 191-92, 214 P2d 1000 (1950).

In previous decisions we have upheld the legislature's classification of income for taxation (*McPherson v. Fisher,* 143 Or 615, 622, 23 P2d 913 (1933)); the legislature's classification of occupations for taxation (*State v. Winegar,* 157 Or 220, 225, 69 P2d 1057 (1937)); a municipal corporation's classifications of various kinds of businesses, trades and professions for a license tax (*Garbade and Boynton v. City of Portland, supra* at 192); the legislature's separate tax treatment of nonresidents for income tax (*Berry v. Tax Commission,* 241 Or 580, 397 P2d 780, 399 P2d 164 (1964)); and the legislature's classification for inheritance tax purposes of property on the basis of its location either inside or outside the state (*Tharalson v. State Dept. of Rev., supra* at 15-17). *See generally* Etter, *Municipal Tax Differentials,* 37 Or L Rev 1 (1957).

As noted above, in the present case the city is levying its business and property taxes on all businesses and property within a geographical area. Therefore, the City is not singling out any fixed group of *persons;* anyone might change or move his business or his property investments in and out of the District. *Cf. Tharalson v. State Dept. of Rev., supra* at 17. The persons subject to the City taxes are subject thereto because they own property or operate a business within the District. Therefore, the tax classification would be constitutional as long as the *geographical* area defined as the District is a valid class.

In his article on municipal tax differentials, Etter notes that location is not a proper basis for classifying property. Etter, *supra* at 41. But he goes on to explain:

"This does not mean * * * that classification which is based on valid factors but which happens to apply to property of a given locality only is thereby rendered invalid. * * *" 37 Or L Rev at 41.

■ ■   We agree. Recognizing the broad freedom a taxing authority has to classify subjects for taxation, we conclude that a classification based on or defined by geographical location is nevertheless constitutionally permissible if it is also based upon qualitative differences that distinguish the geographical area from other areas within the territorial limits of the authority levying the tax. In other words, a taxing authority may not single out a subterritory for exclusive tax treatment (either taxation or exemption) if that subterritory is indistinguishable from the rest of the territory. But if the subterritory is different in quality compared to the rest of the territory, then article I, section 32, does not prohibit a taxing authority from defining the subterritory as a separate class. This requirement is based upon the principle established in our previous decisions that a tax classification is constitutionally valid if it rests upon genuine differences. *See Huckaba v. Johnson, supra* at 25-26 (citing cases). In addition, if the taxing authority selects a subterritory for taxation and that subterritory is the only area so taxed, then the subterritory must not only be qualitatively different but must also be unique.

There may be two types of qualitative differences that might justify singling out a geographical area for tax treatment. One type might be described as natural qualities. These would be qualities that exist in the land by reason of nature, for example, swamp land, or land with less than 20 inches rainfall, or a flood plain. The second type might be described as politically imposed qualities. These would be qualities that exist in the subterritory by political decision, commitment and action, and they may well result because of economic factors or human conditions. Thus the wider significance of the present analysis is that article I, section 32, does not prevent tax classifications from reflecting qualitative differences that result from land use planning decisions. Such planning decisions are almost inevitably stated in territorial terms; but this does not mean that a tax classification

which reflects a land use classification is based only on location and therefore invalid, rather than being validly based on the qualitative difference in land use characteristics.

The Court of Appeals reasoned that the businesses within the District are a distinct and valid class because they all share the same conditions unique to a downtown urban core area. As the court explained,

> "* * * the persons subject to the District taxes share more than a common geographical boundary. They are also likely to share common conditions of transportation, difficulty of access, scarcity of parking, density, degeneration of physical plant, loss of consumer patronage, esthetic depreciation, concentration of polluting agents, declining value and other conditions of modern life which characterize the downtown core area of many cities in Oregon and elsewhere. It is the economic and physical factors of contemporary urban life, not a boundary, which provide the rational basis for the taxes at issue. * * *" 40 Or App at 196.

Although this analysis alone might adequately validate the territorial classification, we find an additional compelling reason why the District is uniquely and qualitatively different from the remainder of the city.

In addition to the fact that the businesses and property within the District presently share, and in the past have shared, the conditions unique to being in a downtown urban area, the City is taxing the District for the purpose of creating a unique area in the future. The City has committed itself to provide a package of special services not provided elsewhere in the city, including free motor vehicle parking, an economic promotion and development program, and a public transportation program. In this regard, the qualities that distinguish the District from the rest of the City are politically imposed. The District is unique not only because it contains the only downtown area in the city, but also because the City has committed itself to providing services and programs that patently and physically distinguish the District from any other area of the city.

■ We therefore hold that the City validly classified the District, and the property and businesses therein, for the purpose of separate tax treatment. This classification does not violate article I, section 32, of the Oregon Constitution. For the same reasons, this classification does not grant any citizen or class of citizens a privilege or immunity that is not equally available to all on the same terms (Or Const art I, § 20), nor does it deny anyone the equal protection of the laws guaranteed by the fourteenth amendment to the United States Constitution.

## Equality and Uniformity Within the District

Plaintiffs also contend that the property and business taxes are not being levied uniformly and equally *within* the District itself. In addition to arguing that the taxes violate article I, section 32, in this regard, plaintiffs argue that the taxes violate the Privileges and Immunities Clause of the Oregon Constitution (art I, § 20)[21] and the Equal Protection Clause of the fourteenth amendment to the United States Constitution.[22]

Plaintiffs argue that the property tax is discriminatorily imposed within the District because certain properties receive tax credits while similar properties do not. They argue that the business taxes are also discriminatorily imposed because professional businesses are taxed at a flat rate, while nonprofessional businesses are taxed on their gross receipts and sales.

---

[21] Article I, section 20, provides:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

[22] The fourteenth amendment to the United States Constitution provides:

"No State shall * * * deny to any person within its jurisdiction the equal protection of the laws."

As noted above, this court recognizes the broad freedom of a taxing authority to classify subjects for taxation. This power to classify includes the authority to subclassify persons included in the general class. *See Huckaba v. Johnson, supra* at 26 (citing cases).

Properties within the District have been subclassified according to whether the property is within the Tenth and Oak Overpark Assessment District (which is located within the Downtown Development District), or according to whether the property is devoted partly or entirely to automobile parking facilities open to the general public on a first-come-first-served basis, free of charge and under control of the Downtown Development District. Properties that provide District-controlled free parking receive a credit that reduces their District property taxes in an amount that reflects the proportion of the property devoted to such public parking. The sum of all the deductions for these properties is then apportioned to all other properties in the District in accordance with their respective assessed valuations. Next, the properties that contributed to the Overpark Assessment District receive a credit equal to their assessment, and that amount is deducted from their District property taxes. The sum of all the deductions for the Overpark assessment is apportioned finally to *all* the properties in the District in accordance with their respective assessed valuations, except the properties whose adjusted property tax does not exceed their Overpark assessment.

■ Plaintiffs contend that the classification for tax credit of properties located within the Overpark Assessment District is an unconstitutional territorial classification. These property owners, however, do not receive credits because they are located in the Overpark Assessment District. They receive credits because they are assessed by the Overpark Assessment District and thus, like the property owners who provide District-controlled parking, they are already financing public parking within the District.

We therefore conclude that the classification of properties within the Overpark Assessment District is valid and that the property tax is uniform as applied to the classes of property within the District.

■     Finally, plaintiffs contend that taxing professional businesses in the District at a flat rate while taxing nonprofessional businesses in the District according to their gross sales and receipts violates the constitutional requirements of equal protection and uniform taxation. We disagree. Article I, section 32, does not demand that a taxing authority treat professional businesses and nonprofessional businesses as the same class of subjects. We therefore conclude that the business taxes do not violate article I, section 32.

For the same reasons, the City's tax scheme does not grant any citizen or class of citizens a privilege or immunity that is not equally available to all on the same terms (Or Const, art I, § 20), nor does it deny anyone the equal protection of the laws guaranteed by the Fourteenth Amendment.

## IV.  DISTRICT PARKING RESTRICTIONS

■     Plaintiffs contend that the city ordinances that restrict parking by those persons employed, resident or lodged within the District while in their place of employment or while in their lodging or residence constitute a denial of equal privileges or immunities under article I, section 20, of the Oregon Constitution or a denial of equal protection under the fourteenth amendment to the United States Constitution. Both constitutional provisions prohibit class discrimination. *See, e.g., School Dist. No. 12 v. Wasco County,* 270 Or 622, 627-28, 529 P2d 386 (1974); *Plummer v. Donald M. Drake Co.,* 212 Or 430, 437, 320 P2d 245 (1958).

Plaintiffs contend that article I, section 20, is violated because District employers, employees, residents and hotel and motel guests are prohibited from enjoying the free parking privileges available to all other members of the public. Article I, section 20,

however, prohibits only the grant of a privilege which does not belong to all citizens *"upon the same terms."* In the instant case, those persons in the District subject to the parking restrictions nevertheless may enjoy the privilege of free parking upon the same terms as all members of the general public: when they are not working or residing in the District. And no member of the public may park for free while he is employed, resident or lodged in the District. We note that the trial court found that these parking restrictions are intended to prohibit those who would regularly be downtown anyway and who would use downtown facilities for longer periods of time from occupying free parking spaces to the exclusion of consumers and clients, thereby defeating the purpose of the free parking program.

We therefore conclude that the terms of the parking ordinance do not violate article I, section 20, of the Oregon Constitution and, for the same reasons, do not violate the fourteenth amendment to the United States Constitution.

CONCLUSION

Plaintiffs raise many other challenges to the City's ordinances; for example, that the ordinances prohibiting parking are void for vagueness, and that the parking program violates the Motor Vehicle Parking Facilities Act (ORS 223.805 to 223.845). Plaintiffs' other challenges are, however, insubstantial and do not merit discussion.

We conclude that the circuit court had jurisdiction over the challenges to the ad valorem property tax. We also conclude that the City's charter amendment and ordinances are lawful and constitutional.

Affirmed as modified.

**PETERSON, J.,** dissenting.

The majority reaches a result which many would agree is socially, politically and economically desirable. But the decision in this case turns not on social desirability, political wisdom or economic need. This case is determined by Article I, section 32, of the Oregon Constitution. I cannot agree with the conclusion of the majority and therefore dissent. My reasons are:

1. Article I, section 32, by its clear terms, prohibits a taxing authority from creating a class of subjects determined by geographical lines.

2. A policy underlying the "territorial limits" clause of Article I, section 32, is to prevent a majority from imposing tax burdens that should be uniformly distributed upon all, upon a minority within the territorial limits of the taxing authority. The imposition of a tax burden only upon those owning property or operating businesses within a geographical area, when similar property exists outside the geographical area but within the taxing district, is improper and violates the uniformity clause.

1.

Article I, section 32, by its terms, prohibits a taxing authority from creating a class of subjects determined by geographical lines

Article I, section 32, provides:

"* * * [A]ll taxation shall be uniform on the same class of subjects within the territorial limits of the authority levying the tax."

The phrase "all taxation shall be uniform on the same class of subjects" was contained in a 1917 amendment to Article I, section 32, which previously required that "all taxation shall be equal and uniform." Prior to 1917, the constitution was construed to require that the rate of taxation "be absolutely

equal upon all property of whatever kind * * * [and] property was required to be valued and taxed at equal rates."[1]

The inclusion in 1917 of the words "all taxation shall be uniform on the same class of subjects" permitted "the classification of property in respect to its nature, condition or class, and the imposition thereon of different rates of taxation upon different classes of property."[2] The framers of the 1917 amendment thus guaranteed that (a) among members of a class, uniformity would exist, and (b) that within the taxing district, territorial uniformity would also exist.

In this case, the "authority levying the tax" is the City of Eugene, not the Downtown Development District. For the purposes of this case, the constitutional provision should be read as follows:

"* * * [A]ll taxation shall be uniform on the same class of subjects within the territorial limits of the [City of Eugene]."

Applying the plain language of the constitution, this requires that all property of the same class within the city be taxed uniformly. There is no claim in this case that properties of the type found in the district are not found elsewhere in Eugene.

The majority upholds the creation of a class determined by geographical location because

"* * * a classification based on or defined by geographical location is nevertheless constitutionally permissible if it is also based upon qualitative differences that distinguish the geographical area from other areas within the territorial limits of the authority levying the tax. * * * [I]f the subterritory is different in quality compared to the rest of the territory, then article I, section 32, does not prohibit a

---

[1] *Standard Lbr. Co. v. Pierce,* 112 Or 314, 334, 228 P 812 (1924).

[2] *Id.* at 335. For an extensive analysis of the uniformity clauses of the various state constitutions, see W. Newhouse, Constitutional Uniformity and Equality in State Taxation (1959).

taxing authority from defining the subterritory as a separate class. * * *" 289 Or at 180.

The majority concludes that a tax classification based upon geographical location is valid if the territory is "qualitatively different," either because of (1) natural characteristics such as "swamp land, or land with less than 20 inches rainfall, or a flood plain," or (2) politically imposed qualitative factors such as those resulting from human conditions or the economy of the area. The majority states:

> "* * * [W]e find an additional compelling reason why the District is uniquely and qualitatively different from the remainder of the city.

> "In addition to the fact that the businesses and property within the District presently share, and in the past have shared, the conditions unique to being in a downtown urban area, the City is taxing the District for the purpose of creating a unique area in the future. The City has committed itself to provide a package of special services not provided elsewhere in the city, including free motor vehicle parking, an economic promotion and development program, and a public transportation program. In this regard, the qualities that distinguish the District from the rest of the City are politically imposed. The District is unique not only because it contains the only downtown area in the city, but also because the City has committed itself to providing services and programs that patently and physically distinguish the District from any other area of the city." 289 Or at 181.

The majority's conclusions do not withstand critical analysis. The "natural characteristics" approach, under which a class of subjects may be determined by the "qualities that exist in the land by reason of nature," may well be a valid approach, if the law defines the class by the natural characteristics and not by location. But that approach was not used by the City of Eugene to define the class and the subdistricting cannot be upheld on that basis.

The City's creation of the District as a separate class must, if at all, be validated under the majority's second theory, based upon a qualitative difference as (a) an area in which "the businesses and property within the District presently share, and in the past have shared the conditions unique to being in a downtown urban area" or (b) as an area upon which the city is imposing additional taxes "for the purpose of creating a unique area *in the future.*" (Emphasis added.)

As to (b), clearly this is a bootstrap approach under which any taxing body could impose additional taxes upon any area because of planned improvement in order to create "a unique area in the future." Under this concept, a slum area consisting of modest homes, owned by their occupants, could be slated for urban renewal "in order to create a unique area in the future." Taxes to renew the area could be imposed solely upon the homeowners. The property owners' inability to pay the increased taxes might well compel them to sell their homes to investors who could afford to pay the higher taxes in anticipation of increased land values after the qualitative improvements had been made. Such a tax, under the majority's reasoning, would be valid. It would also, in a real sense, be confiscatory.

The city's classification of the District, if valid at all, can only be valid because the property within the District shares unique qualities—qualities which are unique to it, and to it only. But there is no evidence in this case that properties of similar type, similar construction and similar use do not exist outside the geographical area.

The only truly *unique* feature of the District is its location.[3] In no other way can it be said that the conditions in the District are totally unique to it.

---

[3] Webster's New International Dictionary of the English Language (2d ed 1961), defines "unique" as "1. Single, sole. 2. Being without a like or equal; single in kind or excellence; unequaled; hence, loosely, unusual; notable."

As to the possibility of regarding the Downtown Development District area as a separate class of property and hence separately taxable under the classification power of Article I, section 32, of the Oregon Constitution, there are obvious difficulties. The only common characteristic the Downtown Development District *must* inevitably share is its location. There are many classifications of property within the area that are common to property immediately outside of the area. Property inside the area is composed of real property, personal property, rental property, inventories, parking lots, perhaps some unimproved property and partially developed property. Whatever its nature, it is clear that similar property exists within the remainder of the city limits of Eugene. Therefore, it cannot be said that any uniform classification was being made within the city on the basis of the property's use or development. Although as stated in *Standard Lbr. Co. v. Pierce,* 112 Or 314, 335-336, 228 P 812 (1924), the classification of property for property tax purposes along functional lines is constitutional under Article I, section 32, such a classification has not in fact been made under the charter and ordinances of the City of Eugene.

Orval Etter, one of the attorneys for the City of Eugene in this case, is well known as an authority on Oregon municipal law. The lead article in the 1957 Oregon Law Review was written by Mr. Etter on the subject "Municipal Tax Differentials."[4] On the subject of classifying property for tax purposes on a geographical basis, Mr. Etter's conclusion leaves no room for doubt—classification based on location is impermissible.

> "(2)   Location Not a Proper Basis. Before specific permissible bases for classifying property for purposes of taxation are listed, it is appropriate to eliminate one basis which is generally not regarded as

---

[4] Etter, *Municipal Tax Differentials,* 37 Or L Rev 1 (1957).

permissible and which apparently is ruled out explicitly and completely by the requirement of territorial uniformity in the Oregon constitution. This basis is location. 'Location of land,' says Cooley [citing 1 Cooley, Taxation 718 (4th ed 1924)], is 'not a proper basis for classification.'" 37 Or L Rev at 41. (Footnotes omitted.)

Mr. Etter hastens to add that, by creating a special taxing district, with authority to levy taxes, taxes can be validly imposed within a subdistrict. He writes:

"Closely related to benefits as a basis for tax classification is the special taxing district in which property in an area is specially taxed to defray the cost of one or more public services specially benefiting that property. Such special taxing districts have been set up innumerable times without violating constitutional requirements that taxes be equal and uniform. Sometimes the rationale for their creation has been that the charges levied in the district have been special assessments and not taxes. Yet the charges have sometimes been called taxes, and the differentiation between the two is not always clear, or at least is sometimes not made explicit. Whatever the proper differentiation between the two, so long as these taxing districts are set up on a reasonable basis, with boundaries that are not wholly arbitrary, they afford a constitutional approach to the problem of classifying property for purposes of public charges. The classification can be based on the benefits received from expenditure of the revenue derived from the charges. Sometimes, indeed, the courts seem to speak interchangeably of classifying property and of including it in a special taxing district.

"The very purpose of these districts 'is to make taxes for certain purposes equal and uniform.' To tax all persons in an area [quoting from 1 Cooley, *supra* at 671, 672, 674]

"'for improvements of a local character may produce the very inequality which is forbidden by state constitutions; and hence the creation of taxing districts for such improvements, so as to place the burden on those specially benefited, creates equality and uniformity rather than destroys it.

"'* * * different taxing districts, for the same general purpose, may be thus created where there are peculiar reasons why one part of the public should bear a proportion of the burden greater than that which should be borne by another, and a greater rate of taxation be imposed on some districts than others.'

"These districts 'may be as numerous as the purposes for which taxes are levied.' " 37 Or L Rev at 44-45. (Footnotes omitted.)[5]

Another way of achieving the goal sought would be to amend the constitution to permit a city to tax some districts differently than others. *Oak Park Federal Savings & Loan Association v. Village of Oak Park,* 54 Ill 2d 200, 296 NE2d 344 (1973), illustrates this point well. There, Article IX, section 10, of the Illinois Constitution of 1870 required that property located within a municipal corporation be taxed uniformly. In 1970, the Illinois constitution was amended to give home rule units the power to make local improvements by special assessment and also "to levy or impose additional taxes upon areas within their boundaries in the manner provided by law for the provision of special services to those areas and for the payment of debt incurred in order to provide those special services." Ill. Const. Art 7, § 6(1). Thus, express constitutional authority allowed cities to create special service districts and to tax them at different rates.

The governing body of Oak Park, Illinois, enacted a series of ordinances "for establishing areas for the providing of special services and provided that the president and board of trustees of the Village of Oak Park shall be the governing body of the special

---

[5] As examples of special districts now permitted under Oregon law, *see, e.g.,* ORS ch 266, Park and Recreation Districts (authority to levy taxes granted by ORS 266.410(5)); ORS 267.510 to 267.650, Transportation Districts (taxing authority provided by ORS 267.620); ORS 440.305 to 440.410, Health Districts (taxing authority granted by ORS 440.395); and ORS 777.005 to 777.725, Ports (taxing power provided by 777.430). *See generally* ORS ch 198, Special Districts Generally, and *Reilly v. Paulus,* 288 Or 573, 607 P2d 162 (1980) (upholding a Metropolitan Service District created under ORS ch 268).

service area. It authorized the levying of taxes by the village board on the property in the special service area. * * *" 296 NE2d at 346. The ordinances also provided for the creation of a shopping mall, landscaping, lighting, and for the imposition of a real estate tax against the property of the special service area for the purpose of purchasing parking lots.

For reasons not relevant to this opinion, the action of the village board was held to be invalid. The case illustrates, however, the point that in order to achieve a subdistricting scheme similar to the one involved in this case, a constitutional amendment was required.

The constitutions of other states contain provisions similar to Article I, section 32, and the courts of those states have construed such provisions to prohibit taxing districts based upon geographical lines.

*Monaghan v. Lewis,* 21 Del (5 Penne) 218, 59 A 948 (1905), is a case involving a law passed by the Delaware legislature which recited:

> "* * * whereas, all that portion of the city of Wilmington, bounded by Seventh Street on the south, Twelfth Street extended on the north, Woodlawn avenue on the east, and Greenhill avenue on the west, the same having but two dwelling houses erected thereon, and deriving no benefit from being within the limits of the said city, and will not derive any benefit for years to come * * *."

The law imposed taxes on the described area at a rate "not exceeding one-fourth of the regular rate levied on persons and estates in the remaining parts of the said city." Article 8, section 1, of the Delaware Constitution provided that "all taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws." The plaintiff contended that the act was unconstitutional and void under Article 8, section 1, because the tax was not uniform upon the same class of subjects within the territorial limits of the authority levying the tax. The Delaware

court held that the law was in direct conflict with the constitutional provision and was void.

      *Essex County Park Commission v. Town of West Orange,* 77 NJL 575, 73 A 511 (1909) involved an act which exempted selected public lands from taxation. The New Jersey constitution directed that "property shall be assessed under general laws by uniform rules." This language had been construed to permit the exemption from taxation of property of various classifications. The challenged act provided that all lands which were the property of a taxing district, and located within the boundaries of the taxing district, were exempted from taxation. If the property owned by the taxing district was located outside the taxing district, it was taxable. The court reasoned that "[i]t is thus sought to form a class for taxation marked by the characteristic of location merely." 73 A at 513.

      The New Jersey court struck down the law, saying:

> "To form a class with reference to the accident of the location of the property is to ignore the fact that differences in the amount of ratables in every taxing district make differences in the amounts assessed for township, county, and state taxes. Whether all property similarly used and possessing the same characteristics is included in the ratables should be the test of the generality of the law. * * *
>
> "Classification according to the location of the property is not a classification according to any feature inherent in the property itself, but with reference entirely to chance of location, a circumstance quite as disconnected with the characteristics of the property itself as its ownership * * *." 73 A at 513.

*Accord, Baldwin Construction Co. v. Essex County Board of Taxation,* 16 NJ 329, 108 A2d 598 (1954), which held that increased assessments in selected areas determined by "arbitrarily fixed geographical boundaries of necessity worked discrimination in respect of comparable properties immediately beyond the unreasoned and artificial borderline." 108 A2d at 603.

If the class is to be fixed with reference to unique characteristics, the classification should be described in those terms, not on geographical terms. Otherwise, any city could create a special taxing subdistrict on a geographical basis and later seek to justify the district on the basis of some "unique characteristics" which had no relevance to its creation. Requiring that the classifications be defined in terms of the unique characteristics of the property at least insures that the authority creating the special district considers those characteristics in determining the necessity for the district.

The record in this case also reflects arbitrary decisions made without reference to any objective criteria. A group of "business people" whose properties were within one block of the northern district boundary requested to have their properties included in the district. According to one of the city planners, these properties did not meet the "distance from the mall criteria [sic]," but the properties were included in the district, nonetheless. Other property owners whose properties met the criterion were excluded from the district because they did not want to be within the district.

I will concede that these variations may be minor. But a classification, the applicability of which depends upon such whims, cannot be valid.

I believe that the majority strains to reach a desired result because it is persuaded that the Eugene City Council has taken a dynamic step toward the solution of a problem chronic to our cities—core area decay—in order to achieve a socially desirable result. I am sympathetic with the goal sought to be attained. Unfortunately, Article I, section 32, expressly prohibits this action. Beyond that, however, the approach of the majority may create the foundation for ills which are more destructive than the ills sought to be cured.

## 2.

A policy underlying the "territorial limits" clause of Article I, section 32, is to prevent a majority from imposing tax burdens that should be uniformly distributed upon all, upon a minority within the territorial limits of the taxing authority. The imposition of a tax burden only upon those owning property or operating businesses within a geographical area, when similar property exists outside the geographical area but within the taxing district, is improper and violates the uniformity clause.

The primary reason justifying the action taken by the city is that a general benefit to the city will result. The majority, at 289 Or 170, states:

> "* * * We agree with the circuit court that the City has shown that there would be a general benefit to the economy of the City as a result of the economic improvement of the City's central business district. Thus the City's program of free parking and District advertising serves a legitimate public purpose. * * *"

In a very real sense, only the property owners, merchants and business people in the District are being taxed and deprived of their parking in order to create a "benefit to the economy of the City as a result of the economic improvement of the City's central business district."

Some contend that the burden of taxes should be imposed according to the benefit which each taxpayer receives from the protection afforded by the government. But almost universally, the public policy of uniformity prevails over the public policy of taxation according to the benefit received.

> "But notwithstanding the rule of uniformity lying at the basis of every just system of taxation, there are doubtless many individual cases where the weight of a tax falls unequally upon the owners of the property taxed. This is almost unavoidable under every system

of direct taxation. But the tax is not rendered illegal by such discrimination. Thus every citizen is bound to pay his proportion of a school tax, though he have no children; of a police tax, though he have no buildings or personal property to be guarded; or of a road tax, though he never use the road. In other words, a general tax cannot be dissected to show that, as to certain constituent parts, the taxpayer receives no benefit. Even in case of special assessments imposed for the improvement of property within certain limits, the fact that it is extremely doubtful whether a particular lot can receive any benefit from the improvement does not invalidate the tax with respect to such lot. * * *" *Union Transit Co. v. Kentucky,* 199 US 194, 203, 26 S Ct 36, 50 L Ed 150 (1905).

The district in this case was created by a vote of the voters of the entire city, and the tax was imposed by a vote of the elected representatives of the voters of the entire city. Beyond question, and in every sense, the majority is imposing a tax upon the minority which (to use the language of the majority opinion) will "benefit * * * the economy of the [entire] City."[6]

Unquestionably, the essence of the democratic process is the sovereignty of the majority. The interests of the many are preferred to those of the few.[7] In that sense, the minority is subject to the will of the majority.

But it is equally well settled that the majority cannot, without restriction, impose economic, social, or political burdens upon the minority that are not common to all. The majority's holding permits the imposition of excessive tax burdens upon the minority.

---

[6] According to one witness, it was a "community [goal] of the City of Eugene."

[7] "The majority * * * exercise a prodigious actual authority * * *; no obstacles exist which can impede or even retard its progress, so as to make it heed the complaints of those whom it crushes upon its path * * *." A. De Tocqueville, Democracy in America 327 (1898 ed).

John Stuart Mill wrote:

"\* \* \* [I]n political speculations, the 'tyranny of the majority' is now generally included among the evils against which society requires to be on its guard.

"\* \* \* \* \*.

"\* \* \* All that makes existence valuable to any one, depends on the enforcement of restraints upon the actions of other people \* \* \*."[8]

The restraint placed upon the legislature is normally found in the state's constitution. Alexander Hamilton referred to restriction of popular government under a constitution so as to secure the protection of the individual's rights from the majority.[9]

The majority's recognition that the language of Article I, section 32, "was intended to prevent anyone from escaping his just share of the tax burden" necessarily includes a recognition that no one should bear more than his or her "just share" of the tax burden. 289 Or at 172.

The evils which Article I, section 32, seeks to avoid (one being discriminatory taxation) are too easily attained by permitting a "classification" defined only by geographical area. Requiring the class to be defined other than by geographical area (as by zone, or type or nature of property) is not onerous and insures that the generality of the law which the constitution intends to insure, is maintained. Differential classifications should be determined by the use of property or by characteristics of the property, not by location. If a tax is imposed by reason of the location of property, some basis for the classification, apart from location, should be apparent from the law itself, rather than by reference to extrinsic matters. If the tax subdistrict is described geographically, some justifiable basis

---

[8] J. S. Mill, On Liberty (1859), in Prefaces to Liberty 244-245 (B. Wishy ed 1959).

[9] *See* G. Dietze, The Federalist 148 (1960).

for the classification, apart from location, should be apparent from the law itself.

If a qualitative class is to exist, the class must be determined by qualitative factors. And if the classification is to have validity, those qualitative factors must be set forth in the law itself.

Justice Jackson, concurring in *Railway Express v. New York,* 336 US 106, 112-113, 69 S Ct 463, 93 L Ed 533 (1949), opined:

> "* * * The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected. Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation."[10]

Strict adherence to Article I, section 32, guarantees that taxation not be the means to unfairly oppress a minority.

Lent, J., joins in this dissent.

---

[10] As to the equal protection aspects of taxation uniformity and the relationship between the Oregon Constitution and the Fourteenth Amendment to the Constitution of the United States, O. Etter, in *Municipal Tax Differentials,* 37 Or L Rev 1, 37-38 (1957), has advanced trenchant arguments which I neither accept nor reject at this time.