**SENIOR CORPORATION,**
**Plaintiff-Appellant and**
**Cross-Appellee,**

v.

**BOARD OF ASSESSMENT APPEALS of**
**the State of Colorado; Board of County**
**Commissioners of the County of Doug-**
**las, Defendants-Appellees,**

**and**

**Denver Southeast Suburban Water and**
**Sanitation District, Defendant-Appellee**
**and Cross-Appellant.**

**No. 83SA98.**

Supreme Court of Colorado,
En Banc.

July 8, 1985.

Calkins, Kramer, Grimshaw & Harring, Wayne B. Schroeder, Daniel N. Larson, Denver, for plaintiff-appellant and cross-appellee.

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Billy Shuman, Asst. Atty. Gen., Denver, for defendant-appellee Board of Assessment Appeals.

James K. Kreutz, Englewood, for defendant-appellee Board of County Commissioners.

Moses, Wittemyer, Harrison & Woodruff, James R. Montgomery, Robert E.L. Beebe, Boulder, for defendant-appellee and cross-appellant.

Collins & Cockrel, P.C., Robert L. Tibbals, Jr., Denver, for amicus curiae Special Dist. Ass'n of Colorado.

KIRSHBAUM, Justice.

The appellant, Senior Corp. (Senior), appeals the district court's judgment affirming a decision of the Board of Assessment Appeals (BAA) which approved a tax levied by the Denver Southeast Suburban Water and Sanitation District (the District) on real property owned, at the time the taxes were levied, by Terracor, Inc. (Terracor), Senior's predecessor-in-interest. The district court rejected Senior's challenge to the constitutionality of the levy, but ordered the levy set aside because the District failed to have it approved by the Douglas County Board of County Commissioners (the Commissioners), as provided in section 32–1–207(2), 13 C.R.S. (1984 Supp.). The court also ordered that the tax would be reinstated in the event such approval were obtained. On appeal, Senior challenges the constitutionality of the levy,[1] asserts that the District had no authority to impose the tax, and argues that the levy was invalid because the District failed to follow requisite statu-

tory procedures. The District cross-appeals that portion of the district court's order requiring it to seek approval of the levy from the Commissioners. We affirm in part, reverse in part and remand the cause with directions.

I

The facts material to this appeal are not disputed. The Denver Southeast Suburban Water and Sanitation District encompasses an area between Parker and Franktown in Douglas County. During the time pertinent to this lawsuit, Terracor owned much of the property within the District and planned to develop a residential community called "the Pinery" on this land. In 1970, the District and Terracor entered into an agreement providing for the financing, installation and operation of water and sewer service to the Pinery; subsequently, an initial service plan was formulated which projected the development, costs and revenues of water and sewer services for a portion of the Pinery. A supplement to this agreement was executed in 1973 and a new service plan, encompassing the original as well as a new service area, was issued in 1974. The service plans were submitted to and approved by the Douglas County Board of County Commissioners.

Development of the Pinery proceeded under Terracor's direction. The District designed and installed water and sewer facilities in the manner requested by Terracor. These installations consisted of "townwide" facilities—major systems designed to serve more than one subdivision—and "intract" facilities—systems designed and constructed to serve a single subdivision and the lots therein exclusively. Development, however, did not proceed as rapidly as projected in either the 1971 or 1974 service plans.[2] Fewer parcels were subdivided, i.e., platted for development, than anticipa-

1. The appeal specifically challenges the constitutionality of § 32–1–1006(1)(b), 13 C.R.S. (1984 Supp.), as applied. Therefore, the appeal was transferred from the Court of Appeals to this court. See §§ 13–4–102(1)(b), –110, 6 C.R.S. (1973).

2. For example, the 1974 Service Plan projected that 1,220 dwelling units would be connected to water and sewer systems in 1981. The 1971 plan had projected 2,020 connections for that year. By 1982, however, only 972 dwelling units had been connected to water and sewer services.

ted, and one platted area had been vacated prior to development. Also, fewer houses and multiple-family structures had been connected to water and sewer systems than projected. As a consequence of slow development, revenue to the District in the form of tap fees, connection fees and service charges fell below expectations.[3]

In 1979, Terracor and the District executed a new contract which rescinded and replaced the 1970 and 1973 agreements. This agreement expressly granted the District "the right to preserve its financial integrity, and to exercise independent judgment in making decisions relative to the expansion of its water and sewer utility systems." It defined "financial integrity," in part, as contemplating increases in the District's general *ad valorem* taxes, connection fees, tap fees, readiness-to-serve charges, and service charges. By the time this litigation commenced, Terracor had experienced serious financial difficulties and development of the Pinery by it had ceased.

A study conducted in 1981 by engineering consultants for the District concluded that approximately thirty percent of the capital costs of town-wide water and sewer facilities in the Pinery, or a sum of $1,202,256, had been incurred by the District to serve property that remained unplatted. The interest on the bonded indebtedness of the District attributable to these facilities was $82,999. On October 30, 1981, the District adopted its budget for fiscal year 1982 which determined that this interest should be paid by the property for which those facilities had been installed. The budget thus divided the District into two areas for tax purposes. Ten unplatted parcels for which town-wide facilities had been constructed constituted the first area and were taxed at a rate of 530 mills per dollar of assessed valuation. All of these parcels were then owned by Terracor. All other land within the District, which consisted of platted subdivisions that were served by both town-wide and in-tract facilities and unplatted land outside the area served by town-wide facilities, comprised the second area and was taxed at a rate of 15 mills.[4]

The ten Terracor parcels subject to the tax levy of 530 mills had an assessed valuation in 1981 of $150,580; the tax from this levy totalled $79,807.40 for 1982.[5] Terracor petitioned the Commissioners to abate taxes in this amount. The petition was denied on December 22, 1981, and Terracor filed an appeal with the BAA.[6] The District intervened as a party respondent in this proceeding. The BAA affirmed, holding that the District "acted within its statutory authority, as provided in [section] 32–1–1006 *et seq.*, [13 C.R.S. (1984 Supp.)] in setting different mill levies for different areas within the District."[7]

Terracor then filed a complaint for judicial review of the BAA's order, pursuant to section 24–4–106, 10 C.R.S. (1982), of the

3. Although the development of the Pinery lagged behind the projections of the service plans, the total assessed valuation of property within the District slightly exceeded the amount estimated. In 1981, the assessed valuation of District property was $14,795,350, approximately $645,000 more than projected in the 1974 Service Plan. The District's tax levy in that year was 15 mills, 5 mills less than the levy projected by that service plan.

4. From 1974 to 1981, the mill levy had been uniform on all property in the District and varied from ten to eighteen mills.

5. According to figures prepared by the Douglas County Assessor, the total property tax payable for 1982 on those parcels was $94,438.30.

6. In its amended petition for abatement of taxes, Terracor alleged that the tax violated § 32–

1–1006(1)(b)(I), (II), 13 C.R.S. (1984 Supp.); art. II, § 25, and art. X, § 3, of the Colorado Constitution; the fourteenth amendment to the federal constitution; and asserted that § 32–1–1006(1)(b)(I), (II), as applied and on its face violated art. X, § 3, of the Colorado Constitution. In its brief on appeal to the BAA, Terracor reasserted these claims and, in a pre-hearing memorandum to the BAA, raised two other issues: whether the District failed to comply with procedures contained in § 32–1–207, 13 C.R.S. (1984 Supp.), for materially modifying a service plan; and whether the District had a factual basis for adopting the tax levy.

7. The BAA did not address the constitutional issues because such issues are beyond its jurisdiction.

State Administrative Procedure Act.[8] Terracor also sought declaratory relief pursuant to sections 13–51–101 to –115, 6 C.R.S. (1973 & 1984 Supp.), and C.R.C.P. 57. The district court concluded that the tax did not violate constitutional requirements of uniformity and upheld the authority of the District to classify property according to services and facilities furnished. However, the court ruled that the 530 mill levy constituted a material modification of the 1974 service plan and, therefore, was subject to the requirement in section 32–1–207(2), 13 C.R.S. (1984 Supp.), of approval by the Commissioners. The district court then set aside the BAA order and ordered the cause remanded to the BAA to set aside the order of the Commissioners "pending compliance by the District with [section] 32–1–207(2)." The court further ordered that the BAA order be reinstated in the event the Commissioners approved the District's levy. This appeal followed.

## II

Senior contends that the District's tax levies violate the uniform taxation provision of article X, section 3, of the Colorado Constitution. Although Senior denominates its argument as an attack on section 32–1–1006(1)(b), 13 C.R.S. (1984 Supp.), "as applied," portions of its argument in effect challenge the validity of the statute on its face.[9] We reject Senior's argument.

Section 32–1–1006(1)(b) provides in part: [T]he board of any sanitation, water and sanitation, or water district has the following powers for and on behalf of such district:

. . . .

(b)(I) To divide such district into areas according to the water or sanitation services furnished or to be furnished therein. The board has the power to fix different rates, fees, tolls, or charges and different rates of levy for tax purposes against all of the taxable property within the several areas of such district according to the services and facilities furnished or to be furnished therein within a reasonable time. . . .

(II) If the board divides a special district into areas according to the facilities and services furnished or to be furnished, to determine the amount of money necessary to be raised by taxation within each such area, taking into consideration other sources of revenue within the area, and to fix a levy which, when levied upon every dollar of the valuation for assessment of taxable property within such area of the special district, will supply funds for the payments of the costs of acquiring, operating, and maintaining the services or facilities furnished in such area and will pay promptly, when due, the principal or interest on bonds or other obligations issued and its pro rata share of the general operating expenses of the district.

The BAA and the district court held that the District acted within the powers granted by this statute, and Senior does not dispute that conclusion here. Senior argues, however, that any statutory scheme that results in different tax levies on various geographical areas within the territori-

---

8. Section 24–4–106 provides judicial review in the district courts for persons adversely affected or aggrieved by agency action. Terracor also brought its action for judicial review pursuant to § 39–8–108(2), 16B C.R.S. (1982). (This section was amended subsequent to the filing of the claim in this action. *See* § 39–8–108(2), 16B C.R.S. (1984 Supp.). The applicability of § 39–8–108(2) to the BAA's ruling has not been questioned. Because the district court had jurisdiction of Terracor's complaint under § 24–4–106, questions concerning the applicability of § 39–8–108(2) to BAA tax abatement proceedings need not be addressed here.

9. In its preliminary statement to the Court of Appeals, Senior proposed to raise this issue on appeal as "[w]hether C.R.S. 1973, § 32–1–1006 (1982 Cum.Supp.) on its face or as applied violates *Colo. Const.* Article X, § 3." On the basis of this statement, the District moved for a determination of jurisdiction pursuant to § 13–4–110(1)(b), 6 C.R.S. (1973). This court accepted jurisdiction. On appeal here, Senior nominally dropped its facial challenge to § 32–1–1006; however, portions of its argument can be construed only as a challenge to the statute on its face.

al limits of the taxing authority violates article X, section 3, of the Colorado Constitution.

■ When the District adopted its budget for fiscal year 1982, section 3 of article X provided, in pertinent part as follows:

All taxes shall be uniform upon each of the various classes of real and personal property located within the territorial limits of the authority levying the tax....[10]

This provision is applicable only to *ad valorem* property taxes, *see, e.g., Colorado Department of Social Services v. Board of County Commissioners*, 697 P.2d 1 (Colo. 1985), and thus applies to the District's tax levy. It requires "that the burden of taxation be uniform on the same class of property within the jurisdiction of the authority levying the tax." *Denver Urban Renewal Authority v. Byrne*, 618 P.2d 1374, 1386 (Colo.1980).

■ Of course, any classification of real property necessarily results in disparate groupings of property of a like class. Section 32-1-1006(1)(b) authorizes districts to divide themselves into taxing areas "according to the water or sanitation services furnished or to be furnished therein." § 32-1-1006(1)(b)(I), 13 C.R.S. (1984 Supp.). In substance, the statute permits water and sanitation districts to classify property according to the levels of services extended to the property. Such classifications inevitably create different taxes on different property, whether the property is analyzed as a "class" or as a "geographical area." The mere fact that a particular classification scheme results in different tax rates on different geographical areas of property does not establish a violation of the constitutional requirement of uniformity.

■ By its reference to "various classes" of real and personal property, section 3 implicitly recognizes the power of the General Assembly to classify property for tax purposes and to prescribe various methods for ascertaining the value of the different classes. *See Ames v. People ex rel. Temple*, 26 Colo. 83, 56 P. 656 (1899). When the General Assembly has exercised this authority, the resulting classification must be reasonable. *See American Mobile Home Association, Inc. v. Dolan*, 191 Colo. 433, 553 P.2d 758 (1976); *District 50 Metropolitan Recreation District v. Burnside*, 167 Colo. 425, 448 P.2d 788 (1968). In *Dolan*, wherein we upheld the General Assembly's power to classify movable structures differently than conventional residences, the test was described as follows:

If the classification conceivably rests upon some reasonable considerations of difference or policy, there is no constitutional violation. The burden is therefore on the one attacking the classification to negative every conceivable basis which might support it....

191 Colo. at 438, 553 P.2d at 762. In *Burnside*, we concluded that a statute exempting certain types of property from tax levies imposed to support recreation districts did not violate constitutional requirements, noting that the classification's reasonableness was "apparent in the statute itself from a consideration of the type of district involved and of the type of property excluded." 167 Colo. at 431, 448 P.2d at 791.

In this case, the District classified property within its boundaries according to the extension of water and sewer services to the property. It concluded essentially that the unplatted Terracor property differed from other property in the District because, unlike other unplatted land within the District, it had been supplied with town-wide water and sewer facilities, and,

---

**10.** Section 3 of article X, was amended, effective December 30, 1982, to provide: "Each property tax levy shall be uniform upon all real and personal property not exempt from taxation under this article located within the territorial limits of the authority levying the tax." *See* H.Con.Res. No. 1005, sec. 1, 1982 Colo.Sess.

Laws 690, 691. Although Senior contends that this provision clearly supports its position and should inform the court of the meaning of the prior version of article X, section 3, we express no opinion about the effect of this amendment upon the controversy before us.

unlike platted land in the District, it had not been furnished with in-tract facilities. Senior does not challenge the fact that these differences exist between the two areas or assert that such a classification is unreasonable. Nor does Senior contend that the District improperly applied section 32–1–1006(1)(b) in establishing these areas. Rather, it argues that the taxing program adopted by the District is prohibited by our decision in *Pueblo Junior College District v. Donner*, 154 Colo. 26, 387 P.2d 727 (1963), because it imposes unequal levies on different geographical areas within the taxing authority's territory. We disagree.

In *Donner*, this court found unconstitutional a statute for funding Colorado's junior colleges because, although it was a state tax, it expressly exempted certain property within the state from that tax. *See id.* at 30–31, 387 P.2d at 730. The funding bill exempted property on two bases: location in a portion of a county included in a junior college district, and location in a county where certain other levies exceeded express limits. *See* House Bill No. 360, ch. 219, sec. 8, 1961 Colo.Sess.Laws 688, 690. The exemptions did not rest on any difference in the nature of the property in different counties, and residents of any county could attend a junior college of their choice. Because the exempt and nonexempt property were similarly situated, we concluded that the exemptions were prohibited by section 6 of article X of the Colorado Constitution as it then existed [11] and resulted in a non-uniform tax burden prohibited by section 3 of that article. We did not, however, address the validity of different tax levies applied to dissimilarly situated property. Here, the District has enacted a program which taxes dissimilar property at different rates. *Donner* does not preclude such a taxation system.

Senior also relies on authority from other jurisdictions in support of its argument that the District may not designate separate taxing areas within its territorial limits. These cases rest on distinguishable factual and legal grounds.

In *Celanese Corp. v. Strange*, 272 S.C. 399, 252 S.E.2d 137 (1979), the South Carolina Supreme Court held unconstitutional a statute permitting special districts to annex contiguous areas and to tax those annexed areas in amounts based upon services received. The dispute arose when a fire and sewer district voted to annex an area that had requested fire protection services only and to tax the new area at one-half the rate applied to property in existing portions of the district. The court found such action to violate the uniform taxation provisions of the South Carolina Constitution, S.C. Const. art. X, §§ 1, 5. However, the classification of property and respective rates of assessment are explicitly set forth in article X, section 1, of that state's constitution and no provision of that constitution permits classification based upon the provision of services. The legislative power to classify *is not so constrained* under our constitution; thus *Strange* does not control the issue here raised.

Senior also relies upon the decision in *Anderson v. City of Asheville*, 194 N.C. 117, 138 S.E. 715 (1927), wherein the Supreme Court of North Carolina concluded that a statute dividing the City of Asheville into three zones for taxing purposes violated requirements of uniform taxation then in that state's constitution. *See* N.C. Const. art. V, § 3, and art. VII, § 9 (1868, amended 1962 & 1969). The Constitution of North Carolina then in effect contains no reference to any legislative authority to create classes of property for taxation purposes, however. Thus, *Anderson* does not control the interpretation of our quite different constitutional framework.[12]

11. At the time *Donner* was decided, article X, section 6, provided in pertinent part: "All laws exempting from taxation, property other than hereinbefore mentioned, shall be void...." *See* Colo. Const. art. X, § 6, C.R.S. 1963. This provision has been amended. *See* Colo. Const. art. X, § 6, 1A C.R.S. (1980).

12. The *Anderson* court interpreted the uniform taxation clauses of the North Carolina Constitution as forbidding classification of property. *See* 194 N.C. at 119–20, 138 S.E. at 716–17. In *Banks v. City of Raleigh*, 220 N.C. 35, 16 S.E.2d 413 (1941), another case relied on by Senior, the North Carolina Supreme Court reiterated the

Senior also cites *State v. Inhabitants of Raritan*, 52 N.J.L. 319, 19 A. 610 (1890), in support of its argument. In this early case, the New Jersey Supreme Court found unconstitutional a statute authorizing townships to divide into streetlamp districts on the ground that the state legislature had no power to establish, or to delegate the power to establish, districts smaller in area than political subdivisions as a basis for imposing taxes. Although the decision did not make reference to any particular constitutional provision, it appears that the New Jersey Constitution then in effect did not refer to property classifications. *See* N.J. Const. art. IV, § 7, ¶ 12 (1844, added 1875, amended 1947 & 1963). The decision turned on the court's concern that inhabitants of streetlamp districts would have no voice in the disposition of the money raised by the proposed tax. *Inhabitants of Raritan*, 52 N.J.L. at 321, 19 A. at 610. In marked contrast, water and sanitation districts in Colorado have been authorized, since their inception, to exercise an array of powers not enjoyed by New Jersey's streetlamp districts, and the governing boards of Colorado's water and sanitation districts are elected by the taxpayers of such districts. *See* ch. 175, sec. 7, 12–13, 1939 Colo.Sess.Laws 597, 599–604. Thus, *Inhabitants of Raritan* provides no support for Senior's position.

A recent decision by the Oregon Supreme Court, *Jarvill v. City of Eugene*, 289 Or. 157, 613 P.2d 1 (1980), interpreting a uniform taxation clause in that state's constitution which contains language almost identical to the language of article X, section 3, of Colorado's constitution, is consistent with our resolution of this issue. In *Jarvill*, taxpayers challenged the validity of an amendment to the charter of the City of Eugene, Oregon, that permitted the city to establish a downtown development district. Pursuant to the charter amendment, the Eugene City Council enacted an ordinance levying *ad valorem* taxes on real property within the district to finance a portion of the costs of programs designed to develop the downtown district. Contending that the only common characteristic of the property was location within the district, the taxpayers asserted that constitutional requirements of uniform taxation prohibited classification of property for taxation purposes on the basis of geographical location.

■ The Oregon Constitution provides, in pertinent part, that "all taxation shall be uniform on the same class of subjects within the territorial limits of the authority levying the tax." Or. Const. art. I, § 32. In *Jarvill*, the Oregon Supreme Court held that this constitutional provision did not prohibit geographical classification "as long as the *geographical* area defined as the District is a valid class." *Jarvill*, 289 Or. at 179, 613 P.2d at 13 (emphasis in original). The court explained its conclusion as follows:

[A] classification based on or defined by geographical location is nevertheless constitutionally permissible if it is also based upon qualitative differences that distinguish the geographical area from other areas within the territorial limits of the authority levying the tax. In other words, a taxing authority may not single out a subterritory for exclusive tax treatment (either taxation or exemption) if that subterritory is indistinguishable from the rest of the territory. But if the subterritory is different in quality compared to the rest of the territory, then

rule of strict uniformity and struck down a statute permitting local authorities to suspend taxation if the annexed property did not receive like services within two years of annexation. Senior presents no reason for adopting these decisions, predicated on very different constitutional principles than those adopted by the citizens of this state, as the law of Colorado.

The North Carolina Constitution has been amended since the *Anderson* and *Banks* decisions and now permits that state's legislature to classify property for taxation. *See* N.C. Const. art. V, § 2(2). It also now permits the legislature to enact general laws authorizing political subdivisions to define territorial areas and levy taxes on those areas according to services, facilities or programs extended to them. *See id.* § 2(4).

article I, section 32, does not prohibit a taxing authority from defining the sub-territory as a separate class.

*Id.* at 180, 613 P.2d at 13. Finding that the creation of a downtown development district rested upon qualitative differences between Eugene's urban core area and other portions of the city, the court upheld the charter amendment and taxation ordinance. The *Jarvill* rationale is consistent with our decisions in *American Mobile Home Association, Inc. v. Dolan*, 191 Colo. 433, 553 P.2d 758 (1976), and *District 50 Metropolitan Recreation District v. Burnside*, 167 Colo. 425, 448 P.2d 788 (1968). Applying this principle to this case leads to the conclusion that the division of the District into taxing areas on the basis of services furnished does not contravene the uniform taxation provision of article X, section 3, of the Colorado Constitution.[13]

Senior also contends that the division of District territory into two taxing areas is unauthorized because no specific constitutional provision permits such action. The argument appears to challenge the authority of the General Assembly to delegate such authority to special districts. We believe this argument rests on a fundamental misconception of state constitutional powers.

■■■ The Colorado Constitution vests the General Assembly with the plenary power to adopt general laws, subject only to the limitations of the Colorado and United States Constitutions. *See In re Y.D.M.*, 197 Colo. 403, 407, 593 P.2d 1356, 1359 (1979); *City & County of Denver v. Lewin*,

---

**13.** We also find some support for this resolution in *Monaghan v. Lewis*, 21 Del. (5 Penne.) 218, 59 A. 948 (1905), a case relied upon by Senior. In *Monaghan*, the Supreme Court of Delaware considered the constitutionality of two statutes concerning taxation of property in the City of Wilmington. The first act, passed in 1897 (1897 Act), provided for a tax rate not to exceed one-fourth of the regular rate on a particularly described plot of land. The second act, passed in 1898 (1898 Act), classified property in Wilmington as to "discriminate between the rural or suburban, and the built-up portion of said City." *See* ch. 106, 21 Del.Laws 244, 245 (quoted in *Monaghan*, 21 Del. (5 Penne.) at 221, 59 A. at 948).

The 1898 Act provided for the rate of taxation on all rural and suburban property in Wilmington to equal one-half of the highest rate. *See id.* It was challenged on grounds that its title was defective as embracing more than one subject and it embraced a subject not expressed in its title in contravention of provisions of that state's constitution. The court, although not confronted with a challenge to this Act's validity under uniform taxation principles, referred to the 1898 Act as "making a general classification of real estate for the purposes of taxation." 21 Del. (5 Penne.) at 223, 59 A. at 949. The court sustained the 1898 Act and furthermore held that it implicitly repealed the 1897 Act because otherwise the Acts would have imposed different rates on similarly classed suburban and rural property. *See id.* at 223–24, 59 A. at 949. The 1897 Act was challenged as violative of a constitutional provision requiring uniform taxation materially identical to section 3 of article X of our constitution. *See* Del. Const. art. VIII, § 1 (1897, amended 1958). From the court's discussion of the 1898 Act, it is clear that the

*Monaghan* court approved of different tax rates when those rates were applied to the whole of a particular class of property, a principle that supports the action taken by the District in this case.

The parties expend some energy debating the outcome of this case under the constitutions and court decisions of Indiana and Illinois. *Compare Hiken Furniture Co. v. City of Belleville*, 53 Ill.App.3d 306, 11 Ill.Dec. 353, 368 N.E.2d 961 (1977) (constitutional amendment permitting home rule municipalities and counties to impose *ad valorem* taxes on limited areas within their boundaries, Ill. Const. art. VII, § 6(*1*)(2), clearly departed from prior constitutional requirement of uniformity) *and Slebodnik v. City of Indianapolis*, 412 N.E.2d 854 (Ind. App.1980) (dicta that Indiana follows general rule that no part of a taxing district may be made to pay a greater proportional tax than any other) *with Hoffmann v. Clark*, 69 Ill.2d 402, 14 Ill.Dec. 269, 372 N.E.2d 74 (1977) (uniformity provision, Ill. Const. art. IX, § 4(a), does not constitute express limitation on legislature's power to classify real property) *and Hayes v. Taxpayers Research Association*, 225 Ind. 242, 72 N.E.2d 658 (1947) (legislature has power to declare a taxing unit greater or less than a township, but classification must be reasonable; taxing entire township for benefit of only a part thereof on the basis that township was purchaser and operator of firefighting equipment was not reasonable). The authorities cited by the parties do not clearly resolve how this case would fare under the respective laws of those jurisdictions and, in any event, do not persuade us to interpret our constitution differently. It will not add to the clarity of this opinion, although it might add considerably to its length, to resolve the debate here.

106 Colo. 331, 105 P.2d 854 (1940). Thus, particular legislation is not susceptible to challenge on the ground that the subject matter is not expressly encompassed within the constitution. Rather, legislation may be declared unconstitutional only when it is prohibited by some particular constitutional limitation. *See In re Y.D.M.*, 197 Colo. at 407, 593 P.2d at 1359. The constitution does not limit the General Assembly from classifying property according to appropriate geographical considerations, nor does it limit the General Assembly from delegating such authority to local governmental units of the state. Therefore, the District's action and the statute authorizing it are not invalid on the grounds that they were not specifically authorized in some part of the constitution.

 In conclusion, we hold that the disparate tax levies of the District are authorized by section 32–1–1006(1)(b), 13 C.R.S. (1984 Supp.), and that this statute, as applied and on its face, does not contravene the uniform taxation provision of article X, section 3, of the Colorado Constitution.

### III

Senior next appears to assert that the General Assembly has, in articles 1 to 13 of Title 39, 16B C.R.S. (1982 & 1984 Supp.), appropriated to itself the sole constitutional authority to classify property for tax purposes, and that, therefore, the District had no authority under section 32–1–1006(1)(b), 13 C.R.S. (1984 Supp.), to classify property for assessment purposes in a manner different from the categories defined in Title 39. Senior reaches this conclusion on the basis of the following statement of purpose contained in section 39–1–101, 16B C.R.S. (1982): "The general assembly declares that its purpose in enacting articles 1 to 13 of this title is to exercise the authority granted in section 3 of article X of the state constitution...." [14] Senior argues that by this language the General Assem-

bly has determined that the taxing authority granted by article X, section 3, of the constitution is to be exercised exclusively by means of the provisions of Title 39.

 This argument ignores the language of section 32–1–1006(1)(b) which expressly permits the District to adopt the classification here challenged. In construing different statutory provisions addressing the same topic, this court must make every effort to give full effect to the legislative purpose of all such provisions. *See Colorado Department of Social Services v. Board of County Commissioners*, 697 P.2d 1 (Colo.1985). Adoption of Senior's argument would in effect nullify the provisions of Title 32 granting authority to special districts to classify property—a result contrary to the express language of section 32–1–1006, not suggested in any fashion by the broad language of section 39–1–101, and not supported by any decisions of this court.

 We also observe that article X, section 7, of the Colorado Constitution authorizes the General Assembly to "by law, vest in the corporate authorities [of any county, city, town or other municipal corporation] respectively, the power to assess and collect taxes for all purposes of such corporation." While this constitutional provision does not directly address the question of authority to make classifications, it does grant broad power to the General Assembly to vest comprehensive taxation power in political subdivisions. It is consistent with the General Assembly's broad legislative authority, *see In re Y.D.M.*, 197 Colo. 403, 593 P.2d 1356, to recognize that the General Assembly may delegate to municipal corporations, as part of their authority to tax for local purposes, the power to classify property for taxation in accordance with services furnished to the property by the corporation.

 The language of section 39–1–101 simply recognizes the constitutional basis

---

**14.** This provision has been amended to conform to the changes made in section 3 of article X.

*See* § 39–1–101, 16B C.R.S. (1984 Supp.).

for the legislation contained in Title 39. We reject the suggestion that this statute reflects an intent by the General Assembly to prohibit itself from adopting other statutes dealing with the imposition of property taxes in the exercise of its constitutional authority, and reaffirm our previous conclusion that the District's classification of Senior's property was expressly authorized by section 32–1–1006(1)(b).

### IV

■ Senior finally contends that the district court erred in ruling that the District could reinstate its levy in the event it obtained the approval of the Commissioners for the levy pursuant to section 32–1–207(2), 13 C.R.S. (1984 Supp.). The District argues in its cross-appeal that it is not subject to section 32–1–207(2) and that, even if its conduct is governed by that statute, its action does not constitute a "material modification" of the original service plan. We conclude that the District is not subject to the requirements of section 32–1–207(2); therefore, we do not address Senior's final argument.[15]

Section 32–1–207(2), 13 C.R.S. (1984 Supp.), provides in pertinent part as follows:

> After the organization of a special district pursuant to the provisions of this part 2 and part 3 of this article, material modifications of the service plan as originally approved may be made by the governing body of such special district only by petition to and approval by the board of county commissioners in substantially the same manner as is provided for the approval of an original service plan.... Such approval of modifications shall be required only with regard to changes of a basic or essential nature, including any addition to the types of services provided by the special district, and shall not be required for changes of a mechanical type necessary only for the execution of the original service plan or for changes in the boundary of the special district.

The District contends that it was not organized "pursuant to the provisions of this part 2 and part 3 of this article." We agree.

■ In 1981, the General Assembly consolidated the statutory provisions applicable to Colorado's various special districts into a single act entitled the "Special District Act" (the 1981 Act). *See* ch. 382, sec. 1, § 32–1–101, 1981 Colo.Sess.Laws 1542, 1542. Section 32–1–207(2) is based upon a nearly identical provision of the "Special District Control Act" of 1965 (the 1965 Act). *See* ch. 225, sec. 9(3), § 89–18–9(3), 1965 Colo.Sess.Laws 887, 892.[16] In tracing

---

**15.** Senior argues that this court has no jurisdiction to consider the issues raised by the District's cross-appeal because the District did not file a timely motion to alter or amend judgment with the district court. This contention has no merit. On November 30, 1982, the district court denied a motion for summary judgment filed by Terracor. Terracor filed a motion to alter or amend judgment on December 15, 1982, and the District then filed a response to this motion, asserting that the trial court erred on the grounds urged in the cross-appeal and requesting the district court to amend its judgment accordingly. The district court denied these requests.

C.R.C.P. 59(h) provides in pertinent part:

When final judgment is entered ... after hearing on motion filed pursuant to Rule 12(c) or 56 [summary judgment] ... the party claiming error may appeal without the necessity of filing a motion for a new trial or a motion to alter or amend a judgment.

In this case, the judgment of the trial court was entered after a hearing on a motion for summary judgment filed pursuant to C.R.C.P. 56. Therefore, the District was not required to file a motion to alter or amend judgment to preserve its right to pursue the issues raised in its cross-appeal.

**16.** The Special District Control Act of 1965 was originally codified at article 18 of chapter 89, C.R.S. (1965 Perm.Cum.Supp.). Chapter 89 was recodified as Title 32 in 13 C.R.S. (1973).

The complete text of § 89–18–9(3), the precursor of § 32–1–207(2), reads as follows:

After the organization of a special district pursuant to the provisions of this act, material modifications of the service plan as originally approved may be made by the governing body of such special district only by petition to and approval by the board of county commissioners in substantially the same manner as is provided for the approval of an original service plan, except that the processing fee for such modification procedure shall not exceed one hundred dollars. Such modifications

the history of the current section 32–1–207(2), we conclude that special districts organized pursuant to legislation that preceded the 1965 Act are not subject to the provisions of that act or section 32–1–207(2).

By its terms, the 1965 Act applied "to any petition for the formation of any *proposed* 'special district' filed in any district court of competent jurisdiction." *Id.* sec. 3, § 89–18–3, at 887 (emphasis added). It required the organizers of any proposed special district to file a service plan with the appropriate board of county commissioners and required any petition filed in a district court to be accompanied by a resolution of such board approving the service plan of the proposed district. *Id.* sec. 4, 5, §§ 89–18–4, –5, at 887–88. A special district organized under the 1965 Act could make "material modifications" of its original service plan "only by petition to and approval by the board of county commissioners in substantially the same manner as is provided for the approval of an original service plan." *Id.* sec. 9(3), § 89–18–9(3), at 892. Thus, a special district that was not subject to the 1965 Act could materially modify the services it provided without obtaining prior approval of the county commissioners.

▬ The 1965 Act also exempted special districts that filed petitions for organization prior to the effective date of that legislation, as follows:

Any petition for the formation of a special district filed in any district court of appropriate jurisdiction prior to May 1, 1965, shall pursue to its conclusion, notwithstanding the provisions of this act. Any petition for the formation of a special district filed in any district court of appropriate jurisdiction after May 1, 1965, shall be subject to the provisions of this act.

*Id.* sec. 10, § 89–18–10, at 892. In this case, the District's petition for organization was filed on April 26, 1965.[17] Because the provisions of the 1965 Act did not govern the District's petition, the District was not "organized pursuant to" that statute. Consequently, the District was not subject to the provision of the 1965 Act requiring prior approval by appropriate county commissioners before adopting material modifications to its service plan.

The Special District Control Act of 1965 was repealed and reenacted as part 2 of the Special District Act of 1981. *See* ch. 382, sec. 1, 1981 Colo.Sess.Laws 1542, 1547–51. Section 32–1–201, 13 C.R.S. (1984 Supp.), now limits the general applicability of part 2 of the 1981 Act to "any petition for the *organization* of any proposed special district filed in any district court of competent jurisdiction...." (emphasis added).[18] This provision merely reiterates the applicability provision of the 1965 Act and does not expand the matters subject to it. Furthermore, the particular provision at issue in this case contained its own limitations; section 32–1–207(2) applies only to circum-

shall be required only with regard to changes of a basic or essential nature and shall not be required for changes of a mechanical type necessary only for the execution of the original service plan.
Ch. 225, sec. 9(3), § 89–18–9(3), 1965 Colo.Sess. Laws 887, 892.

17. The petition was presented "pursuant to and in accordance with Chapter 89, Article 5, [C.R.S.] 1963, as amended." The article referenced was the then-extant enactment governing water and sanitation districts.

18. Although § 89–18–9(3) referred to the "organization" of a special district rather than its "formation" as the basis for conditioning the applicability of that section of the 1965 Act, we do not find that those terms connote different meanings. In § 89–18–3, the term "special dis-

trict" was defined to refer to any of the various service districts "organized under the local improvement and service district laws of this state." Ch. 225, sec. 3, § 89–18–3, 1965 Colo. Sess.Laws 887, 887. At that time, the service district law pertaining to water and sanitation districts also provided that "[t]he organization of a district shall be initiated by a petition filed in the office of the clerk of the court...." § 89–5–4, C.R.S. 1963. It is probable that the General Assembly used the terms "organization" and "formation" synonymously, in accord with their common meanings. When § 89–18–3 was repealed and reenacted in 1981, the General Assembly replaced the word "formation" with "organization" in this phrase. *See* § 32–1–201, 13 C.R.S. (1984 Supp.).

stances which might develop "[a]fter the organization of a special district *pursuant to the provisions of this part 2 and part 3 of this article.*" (emphasis added).[19]

■ The reenactment of the 1965 Act as part 2 of the 1981 Act did not alter the District's status with regard to this provision. The District was not organized pursuant to part 2 and part 3 of the 1981 Act. Considering the history and purposes of this legislation, we agree with the District that because its petition for organization was not governed by the 1965 Act, its taxing plan is not now subject to the requirements of section 32–1–207(2).

■ Senior asserts that section 32–1–308(1), 13 C.R.S. (1984 Supp.), subjects all special districts to the provisions of section 32–1–207(2). Section 32–1–308(1) provides in pertinent part as follows:

The provisions of this article which become effective July 1, 1981, shall apply to all special districts existing on June 30, 1981, or organized thereafter; except that any such existing district need not obtain a name change to conform to this article and that any district may continue to operate for the purpose or purposes for which it was organized.[20]

The District did, of course, exist on June 30, 1981. However, when particular provisions of a statute contain their own conditions on applicability, the statute can be "applied" only to the extent and upon the subject permitted by such special provisions. *Cf.* § 2–4–205, 1B C.R.S. (1980) (special provision prevails over general one if in conflict). Section 32–1–207(2) expressly limits its application to special districts organized pursuant to specified parts of the

1981 Act. We have concluded that the District was not organized pursuant to such authority; thus, section 32–1–207(2), when applied to the District as part of the 1981 Act, results in the exemption of the District from the requirement of obtaining approval from the Commissioners before modifying its basic service plan.

V

In summary, we affirm the district court's judgment that section 32–1–1006(1)(b), 13 C.R.S. (1984 Supp.), is constitutional on its face and as applied to Senior in this case. We also affirm the district court's conclusion that the District acted within its constitutional and statutory authority in classifying property for purposes of imposing *ad valorem* property taxes according to the type and extent of services furnished to particular parcels of property within the District. The judgment of the district court is reversed insofar as it determines that the District must comply with the provisions of section 32–1–207(2), 13 C.R.S. (1984 Supp.), and the cause is remanded to the district court with instructions to affirm the decision of the BAA.

---

**19.** Part 3 of article 32 provides the procedures for filing a "petition for organization" with an appropriate court. *See* §§ 32–1–301 to –308, 13 C.R.S. (1984 Supp.). The reference in § 32–1–207(2) to part 3 does not affect the analysis of this issue.

**20.** Section 32–1–308 also contains the following provision on the applicability of the 1981 Act:

Any proceedings for the organization of a special district which were commenced prior to July 1, 1981, may continue pursuant to the laws in effect at the time such organization was commenced until the district court has declared the district organized. Thereafter, the special district shall be subject to the provisions of this article. Any such organizational proceedings which are dismissed by the board of county commissioners or by the district court and which are recommenced after July 1, 1981, shall be governed by the provisions of this article.

§ 32–1–308(2), 13 C.R.S. (1984 Supp.). No party to this appeal has relied on this provision for resolution of this issue.